[No. D037659. Fourth Dist., Div. One. May 13, 2002.]

VIRTUALMAGIC ASIA, INC., Plaintiff and Appellant, v.
FIL-CARTOONS, INC., et al., Defendants and Respondents.

**COUNSEL**

Cantor & Weinshenk, Steven W. Weinshenk and Jon D. Cantor for Plaintiff and Appellant.

Burkhardt & Larson and Philip Burkhardt for Defendants and Respondents.

**OPINION**

**McDONALD, Acting P. J.**—In 1999 respondent Fil-Cartoons, Inc. (Fil-Cartoons) entered into a contract with a California-based company, Casey-Werner Company (CWC), to provide animation production services for CWC's 13-episode film project known as the GDB project. Fil-Cartoons then entered into a subcontract with appellant VirtualMagic Asia, Inc. (VMA) to provide the digital ink and paint portion of the animation production services for the GDB project.

Disputes arose over the amount Fil-Cartoons owed to VMA for the services VMA provided in connection with "retakes," and VMA filed the present action against Fil-Cartoons. VMA's action also named as defendants Kenneth E. Barackman and two corporations (Fantasia Animators Philippines, a Philippine corporation, and Fantasia Animators, Inc., a Nevada corporation), which are apparently the parent corporations of Fil-Cartoons. Although Barackman is a California resident, neither Fil-Cartoons nor its two corporate parents (collectively respondents) are California corporations. Respondents moved to quash service of the summons and complaint, arguing their California contacts were insufficient to permit a California court to exercise personal jurisdiction over them. The court granted the motion; VMA appeals.

We conclude that even if Fil-Cartoons lacks sufficient California contacts to permit a California court to exercise *general* jurisdiction over it, the claim asserted by VMA arises out of or is related to Fil-Cartoons' California-based activities and therefore California may exercise *specific* jurisdiction over Fil-Cartoons for this claim. We also conclude that unresolved factual issues exist with regard to jurisdiction of California courts over Fil-Cartoons' corporate parents. We therefore reverse and remand the case to the trial court.

I

FACTUAL AND PROCEDURAL BACKGROUND[1]

A. *The Participants*

Fil-Cartoons is a Philippines corporation. Its production and animation facilities are located, and the work it performs on its animated projects occurs, in the Philippines. It performs work for clients who are situated throughout the world, including California-based companies. For fiscal years 1997 through 2000, Fil-Cartoons' per-year gross sales averaged between $3.5 million to $4 million, over 30 percent of which was derived from projects performed for California-based companies.

[1] In this case, we apply different standards of review to the distinct issues presented. (Cf. *McMillan-BCED/Miramar Ranch North v. County of San Diego* (1995) 31 Cal.App.4th 545, 554 [37 Cal.Rptr.2d 472].) To the extent there is conflicting evidence, we resolve all conflicts in the relevant evidence against the appellant and in favor of the order. (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 535 [99 Cal.Rptr.2d 824].) However, after the determinative historical or physical facts are settled, the question of jurisdiction is a question of law subject to de novo review. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 449 [58 Cal.Rptr.2d 899, 926 P.2d 1085] (*Vons*).) Our factual recitation states the facts insofar as they are either undisputed or, to the extent there was any conflict in the evidence, are facts found by the trial court that are supported by substantial evidence.

Fil-Cartoons is wholly owned by Fantasia Animators Philippines, a Philippine corporation (Fantasia Philippines). Another corporation, Fantasia Animators, Inc., a Nevada corporation (FAN), owns all or most of the stock of Fantasia Philippines. Barackman owns all of the stock of FAN.[2] Barackman is the president and a director of Fil-Cartoons, the president and chairman of the board of Fantasia Philippines, and the president and sole director of FAN.

VMA is a Turks and Caicos corporation whose majority shareholder is VirtualMagic Animation, a California corporation (VMA-Calif.). VMA is in the business of providing digital animation ink and paint services using its production facilities in the Philippines. VMA-Calif. also provides digital animation ink and paint services using its Hollywood, California offices as its production facilities.

B.  *The Contracts*

In 1999 Barackman negotiated on behalf of Fil-Cartoons the contract with CWC under which Fil-Cartoons agreed to provide the animation production services for the GDB project. The contract negotiations included meetings with CWC representatives at CWC's offices in Southern California, and drafts of a proposed written agreement were sent by CWC to Barackman at Fil-Cartoons' California address. However, the parties never signed a final written contract.[3]

During the course of the negotiations, CWC asked Fil-Cartoons to use VMA as Fil-Cartoons' subcontractor for the digital ink and paint services for the GDB project. Between April and July 1999 Mr. Spielvogel, president of VMA and VMA-Calif., was in regular contact with Barackman to negotiate the terms under which VMA would provide the digital ink and paint services for the GDB project. Barackman met with Spielvogel at the Hollywood, California offices of VMA-Calif. on at least two occasions to negotiate the terms of VMA's engagement. The two men also exchanged telephone calls between VMA-Calif.'s Hollywood office and Barackman's home in California to discuss the subcontract. They finally reached agreement on the price when Barackman called from the Philippines and told Spielvogel that VMA's price was acceptable. During this same period, Spielvogel was in weekly contact with CWC's representative to discuss aspects of VMA's participation in the GDB project.

---

[2]Barackman apparently acquired sole control of FAN by agreeing to buy the share of FAN previously owned by the Smiths. Barackman pledged 80 percent of his FAN stock as collateral to secure performance of that stock purchase agreement.

[3]Although the parties exchanged several written drafts of their agreement, the final written contract was never signed.

## C. *The California Connections*

The bulk of the physical production work by Fil-Cartoons under its contract with CWC, and by VMA under its subcontract with Fil-Cartoons, was performed in the Philippines. However, many aspects of the GDB project were performed in California. During August 1999 Barackman and Spielvogel met in the Los Angeles area, and exchanged telephone calls while Barackman was at home in California, to discuss VMA-Calif.'s participation in the promotional segment for the GDB project. In September 1999 Fil-Cartoons delivered its animated production work product/film for that promotional segment to VMA-Calif. and VMA-Calif. completed the compositing work on that segment. In September, representatives from CWC, Fil-Cartoons and VMA met at VMA-Calif.'s Hollywood office to confirm the GDB project was a "go," and to discuss CWC's delivery of its materials to Fil-Cartoons and the logistics of how CWC would exercise quality and production controls over the animation production activities by Fil-Cartoons and VMA. They agreed that CWC would provide an on-site representative at Fil-Cartoons' Philippines production facility; Fil-Cartoons would deliver weekly production reports and exemplary work in progress to CWC's Encino, California office; and the production activities involved in the GDB project would be a collaborative effort involving the California offices of CWC and VMA-Calif. and the Philippines production facilities of VMA and Fil-Cartoons.[4]

During the fall of 1999, after "first-take" footage was delivered to CWC's Encino office and reviewed by CWC, Fil-Cartoons and VMA began working on the retakes required by CWC; some retakes were ordered for technical reasons and others were ordered for creative reasons.[5] The logistics of the retake process involved numerous communications by mail, facsimile, telephone, e-mail and face-to-face meetings between personnel of CWC, VMA,

---

[4]The control exercised by CWC as producer over Fil-Cartoons and its subcontractors in the production process is standard in the industry. The California producer typically creates preproduction materials that serve as the *blueprint* for the animation production, provides an on-site technical representative to supervise the daily production activities, and requires the subcontractors to deliver work in progress to California (to allow review or revision by the production company) and weekly production reports. Additionally, after the *finished* product is delivered to the California producer for review, the California producer may "call 're-takes'" of portions of the production for either creative or technical reasons, and the subcontractors will then revise those portions in accordance with the instructions of the California producer.

[5]After the finished footage of the first-takes were delivered to CWC's Encino office, the footage was reviewed by CWC personnel to determine whether any technical or creative retakes would be required. CWC called for a technical retake when the first-take did not conform to the storyboard, the exposure sheets, the camera moves or because the ink and paint required revision. CWC called for creative retakes when the footage conformed to its original requirements but upon review CWC wanted to improve the product by, for example,

and Fil-Cartoons in California and in the Philippines. VMA performed its retake work but temporarily withheld delivery to CWC of the completed retakes because Fil-Cartoons declined to pay the amounts VMA demanded. VMA eventually delivered the completed retakes to CWC after receiving partial payment directly from CWC.

### D. *The Dispute*

Fil-Cartoons and VMA originally agreed VMA would receive $32,000 per episode but they did not specifically agree on the method for billing retakes.[6] Fil-Cartoons considered VMA's billings for retake work grossly excessive, and declined to pay the amounts demanded by VMA. VMA then filed this action seeking damages of approximately $275,000.

### E. *The Motion to Quash*

Respondents moved to quash service for lack of jurisdiction.[7] After several months of discovery, the court concluded respondents' business in California was not sufficiently substantial, continuous and systematic for purposes of general jurisdiction over respondents. The court also concluded the contract between CWC and Fil-Cartoons was irrelevant to its jurisdictional analysis, that only the subcontract between Fil-Cartoons and VMA was at issue, and that respondents' contacts with California were not sufficiently related to VMA's claim on that subcontract to permit California to exercise specific jurisdiction over VMA's claim.

## II

### ANALYSIS

### A. *Standards for Exercising General and Specific Jurisdiction over Foreign Defendants*

■ Code of Civil Procedure section 410.10 permits a California court to exercise jurisdiction on any basis not inconsistent with state or federal

---

making a joke funnier. Barackman attended at least one lengthy retake meeting at CWC's Encino offices during which CWC made decisions on retakes.

[6]Barackman averred that he and Spielvogel agreed to fairly apportion the retake revenues from CWA based on the relative contributions of each company, but that VMA's share would not exceed one-third of the total amounts paid by CWC.

[7]Respondents alternatively moved to dismiss on grounds of forum non conveniens. That motion was denied without prejudice. The trial court's ruling on the motion to quash made unnecessary any definitive disposition by it of respondents' forum non conveniens motion. Because we conclude the ruling on the motion to quash was error, we must therefore remand the matter to the trial court. The forum non conveniens issue is not ripe for appellate review and we express no view on whether the trial court might properly grant a forum non conveniens motion if respondents elect to renew the motion on remand.

constitutional principles. The principles governing jurisdiction "are simple to state but difficult to apply." (*Sonora Diamond Corp. v. Superior Court, supra,* 83 Cal.App.4th at p. 535.) The guiding precept is that a court may exercise jurisdiction over a nonresident defendant only if the defendant's *minimum contacts* with the forum state are sufficient to make the maintenance of the action inoffensive to traditional concepts of fair play and substantial justice. (*Internat. Shoe Co. v. Washington* (1945) 326 U.S. 310, 320 [66 S.Ct. 154, 160, 90 L.Ed. 95, 161 A.L.R. 1057].) The converse is equally true. "[E]ach individual has a liberty interest in not being subject to the judgments of a forum with which he or she has established no meaningful minimum 'contacts, ties or relations.' (*Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 471-472 [85 L.Ed.2d 528, 540, 105 S.Ct. 2174] (*Burger King*) . . . .) As a matter of fairness, a defendant should not be 'haled into a jurisdiction solely as the result of "random," "fortuitous," or "attenuated" contacts.' (*Burger King, supra,* 471 U.S. at p. 475 [85 L.Ed.2d at p. 542].)" (*Vons, supra,* 14 Cal.4th at p. 445.)

If, as a result of the defendant's conduct in or connection with the forum state, the defendant should reasonably anticipate being subject to suit in the state, minimum contacts exist. (*World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, 297 [100 S.Ct. 559, 567, 62 L.Ed.2d 490].) If the defendant is a foreign corporation, the question whether "jurisdiction may be constitutionally exercised depends upon the circumstances of each individual case. [Citations.] [T]he analysis is concerned with weighing the various relevant 'contacts' by the foreign corporation within the state attempting to exercise jurisdiction." (*Empire Steel Corp. v. Superior Court* (1961) 56 Cal.2d 823, 831 [17 Cal.Rptr. 150, 366 P.2d 502].)

■ As explained by the court in *Sonora Diamond Corp. v. Superior Court, supra,* 83 Cal.App.4th at page 536: "The concept of minimum contacts embraces two types of jurisdiction—general and specific. General jurisdiction results where the defendant's contacts with the forum state are so 'systematic and so continuous as to make it consistent with traditional notions of fair play and substantial justice to subject the defendant to the jurisdiction of the forum, even where the cause of action is unrelated to the contacts.' [Citations.] Specific jurisdiction results when the defendant's contacts with the forum state, though not enough to subject the defendant to the general jurisdiction of the forum, are sufficient to subject the defendant to suit in the forum on a cause of action related to or arising out of those contacts. [Citations.] *Specific* jurisdiction exists if: (1) the defendant has purposefully availed itself of forum benefits with respect to the matter in controversy; (2) the controversy is related to or arises out of the defendant's contacts with the forum; and (3) the assertion of jurisdiction would comport with fair play and substantial justice. [Citations.]" (Original italics.)

In this case, we focus on whether California may assert specific jurisdiction over Fil-Cartoons for this particular dispute.[8] ■ The *Vons* court refined the analytical framework for evaluating the issue of specific jurisdiction by explaining that a court must first examine whether the nonresident defendant has purposefully availed itself of forum benefits, noting: "The United States Supreme Court has described the forum contacts necessary to establish specific jurisdiction as involving variously a nonresident who has 'purposefully directed' his or her activities at forum residents (*Burger King, supra*, 471 U.S. at p. 472 [85 L.Ed.2d at p. 541]), or who has 'purposefully derived benefit' from forum activities (*id.* at p. 473 [85 L.Ed.2d at p. 541]), or ' "purposefully avail[ed himself or herself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." ' (*Id.* at p. 475 [85 L.Ed.2d at p. 542].) The court also has referred to the requisite forum contact as involving a nonresident defendant who ' "deliberately" has engaged in significant activities with[in] a State [citation] or has created "continuing obligations" between himself and residents of the forum [citation]' (*id.* at pp. 475-476 [85 L.Ed.2d at p. 543]), concluding that in such cases the defendant 'manifestly has availed himself of the privilege of conducting business [in the forum], and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.' [Citation.]" (*Vons, supra,* 14 Cal.4th at p. 446.)

For purposes of evaluating specific jurisdiction, after the defendant is shown to have purposefully availed itself of the benefits of conducting business within the forum, the court then considers those contacts in the context of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice. (*Vons, supra,* 14 Cal.4th at p. 447.) Under the *Vons* framework, when California is asked to exercise specific jurisdiction over a particular claim and the court is satisfied the defendant purposefully availed itself of the benefits of conducting business within California, "the appropriate inquiry [becomes] whether the plaintiff's cause of action 'arises out of or has a substantial connection with a business relationship defendant has purposefully established with California.' " (*Vons, supra,* at p. 448, quoting from *Cornelison v. Chaney* (1976) 16 Cal.3d 143, 149 [127 Cal.Rptr. 352, 545 P.2d 264].) Thus, under *Vons,* the court asks (1) what is the business relationship between the

---

[8]Because we conclude that specific jurisdiction exists, it is unnecessary to decide whether Fil-Cartoons, a company that derives over 30 percent of its revenues from services it provides to California companies, has sufficiently substantial, systematic and continuous contacts to permit California to assert jurisdiction over a claim against Fil-Cartoons unrelated to Fil-Cartoons' forum contacts.

defendant and California-based interests, (2) what is the claim asserted by the plaintiff against the defendant and (3) is there substantial nexus or relationship between the two because the latter arises out of or is substantially connected to the former. (*Vons, supra*, at p. 448 [" 'The crucial inquiry [thus] concerns the character of defendant's activity in the forum, whether the cause of action *arises out of or has a substantial connection* with that activity, and upon the balancing of the convenience of the parties and the interests of the state in assuming jurisdiction.' . . ." (Citation omitted.)].) The first inquiry addresses the purposeful availment issue, and the latter two inquiries focus on whether the particular claim is substantially related to the defendant's forum contacts.

The application of that framework to the facts presented in *Vons* illustrates the proper approach. In *Vons*, a meat processor, faced with potential liability in a California lawsuit for an outbreak of E. coli connected with the meat it sold to a California-based company (Foodmaker), cross-complained against two foreign cross-defendants. Although the bulk of the foreign cross-defendants' economic activities were in the State of Washington, they had contacts with California because they entered into franchise agreements with Foodmaker. As part of their franchise agreements with Foodmaker, they received training and instructions from, and were required to adhere to the standards established by, Foodmaker in preparing the food they purchased from Foodmaker, and made payments to Foodmaker. (*Vons, supra,* 14 Cal.4th at pp. 440-443.) Vons cross-complained against the foreign cross-defendants, alleging they improperly prepared the food carrying the E. coli bacteria for which Vons was potentially liable. On these facts, the *Vons* court found the foreign cross-defendants purposefully availed themselves of the benefits of conducting business within the California forum, noting that if Foodmaker had sued the foreign cross-defendants for breach of the franchise agreement, California would have specific jurisdiction to adjudicate the claims.[9] (*Id.* at pp. 450-451.)

Because *Vons* was satisfied that the purposeful availment factor would, under *Burger King,* support specific jurisdiction in a hypothetical dispute between the foreign defendant and his California franchisor over their economic relationship, *Vons* then examined the *relatedness* factor. *Vons*

[9]The franchise agreements considered in *Vons* contained a forum selection clause. The analogous contract here—the CWC/Fil-Cartoons contract—was oral because the parties did not sign the written agreement. Therefore, the CWC/Fil-Cartoons contract contains no forum selection clause. Respondents argue the absence of a forum selection clause in the CWC/Fil-cartoons contract is a crucial distinction that makes the *Vons* analysis inapplicable to this case. However, the *Vons* analysis shows it was the California-based *economic relationship* that made California a proper forum for the hypothetical lawsuit, and that the forum selection clause only *settled* the issue. (*Vons, supra,* 14 Cal.4th at pp. 450-451.)

recognized that *Burger King*: "did not specifically discuss the further requirement that the claim 'arise out of' or be 'related to' the defendant's forum activity in order to warrant the exercise of specific jurisdiction, and that the meaning of that requirement is implicated in the present case. We also recognize that in *Burger King*, the claim involved a contract action that arose *directly* from the forum contact, that is, the ongoing franchise relationship, and that the litigation involved the same parties as were involved in the forum contact. The present case is distinguishable from *Burger King* in that the cross-complainant was not a party to the franchise contract, and thus the claim is not on the contract as was the dispute in *Burger King*. This distinction, however, does not render the exercise of specific jurisdiction improper." (*Vons, supra,* 14 Cal.4th at pp. 451-452, original italics, fn. omitted.)

■ "*A claim need not arise directly from the defendant's forum contacts in order to be sufficiently related to the contact to warrant the exercise of specific jurisdiction.* Rather, as long as the claim bears a substantial connection to the nonresident's forum contacts, the exercise of specific jurisdiction is appropriate. The due process clause is concerned with protecting nonresident defendants from being brought unfairly into court in the forum, on the basis of random contacts. That constitutional provision, however, does not provide defendants with a shield against jurisdiction when the defendant purposefully has availed himself or herself of benefits in the forum. The goal of fairness is well served by the standard we originally set out in *Cornelison, supra,* 16 Cal.3d 143, that is, there must be a *substantial connection* between the forum contacts and the plaintiff's claim to warrant the exercise of specific jurisdiction." (*Vons, supra,* 14 Cal.4th at p. 452, first italics added.)

*Vons* noted the relatedness factor is a flexible one that emphasizes the nature of the connection between the claim and the defendant's forum contacts. "[T]he relatedness element of specific jurisdiction 'does not require that the cause of action formally "arise from" defendant's contacts with the forum; rather, this criterion requires only "that the cause of action, of whatever type, *have a substantial connection with* the defendant's in-state activities." . . . "Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that [contact]." ' [Quoting *Third Nat. Bank in Nashville v. Wedge Group Inc.* (6th Cir. 1989) 882 F.2d 1087, 1091]." (*Vons, supra,* 14 Cal.4th at pp. 454-455, italics added in *Third Nat.*) Importantly, when examining the relationship between the claim and the defendant's forum contacts, the "arising out of or relating to" standard is a disjunctive, flexible standard that does *not* require the defendant's forum contacts be directed at the plaintiff to warrant the exercise of specific jurisdiction. (*Id.* at p. 455.)

Applying those standards, *Vons* concluded there was specific jurisdiction over the cross-complainant's claim against the foreign cross-defendants for two reasons. First, it was "the relationship [the foreign cross-defendants] established in the forum [that] drew these [cross-]defendants and [cross-complainant] into a relationship . . . ." (*Vons, supra,* 14 Cal.4th at p. 456.) Second, because the forum-based relationship imposed controls over the foreign cross-defendants' method of doing business, the forum-based relationship was itself a contributing factor to the injury for which the cross-complaint sought compensation. Accordingly, *Vons* concluded the claims asserted by the cross-complaint arose out of or were substantially related to the California-based contractual relationship between Foodmaker and the foreign cross-defendants, and satisfied the requirements for specific jurisdiction. (*Vons, supra,* 14 Cal.4th at pp. 456-457.)

B. *California Has Specific Jurisdiction over VMA's Claim Against Fil-Cartoons*

■ The first inquiry is whether Fil-Cartoons purposefully availed itself of the benefits of doing business in California. This requirement for special jurisdiction is satisfied under any of the various verbal formulations described in *Vons*. The CWC/Fil-Cartoons contract shows that Fil-Cartoons "purposefully directed" its activities at a forum resident (*Burger King, supra,* 471 U.S. at p. 472 [105 S.Ct. at pp. 2181-2182]), "purposefully derive[d] benefit" from forum activities (*id.* at p. 473 [105 S.Ct. at pp. 2182-2183]), and " 'purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " (*Id.* at p. 475 [105 S.Ct. at p. 2183].) If either CWC or Fil-Cartoons had brought suit on the CWC/Fil-Cartoons contract against the other party, California would have jurisdiction over that lawsuit.[10] Fil-Cartoons argues it did not purposefully avail itself of the privilege of conducting activities within California because the work it did for CWC was performed in the Philippines, and the only contact the CWC/Fil-Cartoons contract had with California was that it was partially negotiated in California. However, the undisputed facts show that Fil-Cartoons negotiated and contracted with CWC, took directions from and communicated with CWC within and outside

---

[10]Fil-Cartoons argues the CWC contract is irrelevant because it is the subcontract, not the prime contract, that is at issue in the present lawsuit, and the subcontract has no substantial contact with California. This argument is similar to the rationale adopted by the Court of Appeal in *Vons* that was squarely rejected by the Supreme Court when it stated that, "[c]ontrary to the Court of Appeal's thesis, however, the defendant's forum activities need not be directed at the *plaintiff* in order to give rise to specific jurisdiction. [Citations.] The United States Supreme Court has stated more than once that the nexus required to establish specific jurisdiction is between the defendant, *the forum*, and the litigation [citations]—not between the plaintiff and the defendant." (*Vons, supra,* 14 Cal.4th at pp. 457-458, original italics.)

California to perform that contract, held meetings with CWC in California concerning performance of the contract, delivered the work in progress and final work to California, and was paid by CWC. These undisputed facts demonstrate Fil-Cartoons purposefully directed its activities at a forum resident and purposefully derived economic benefits from forum activities within the meaning of *Vons.*

██ We are also convinced, for reasons analogous to the rationale adopted in *Vons,* that the claim asserted by VMA against Fil-Cartoons arises out of or is substantially connected to Fil-Cartoons' forum-based contractual relationship with CWC. First, VMA's lawsuit seeks recovery under a subcontract that was directly spawned by Fil-Cartoons' forum-based contract with CWC. To paraphrase the first rationale *Vons* relied on to find that relatedness existed, "the relationship [Fil-Cartoons] established in the forum *drew [Fil-Cartoons] and [VMA] into a relationship*" to perform the digital ink and paint work as a subset of the California contract. (*Vons, supra,* 14 Cal.4th at p. 456, italics added.) Second, it appears VMA's lawsuit in whole or in part alleges it is owed money for the retake work involved when CWC, after reviewing the first-take materials, called for creative and technical retakes on portions of the GDB project. CWC's right to control the work performed by Fil-Cartoons and its subcontractors on the GDB project, and in particular to call for creative and technical retakes that required the additional work by VMA that is the subject of this lawsuit, arose out of the California-based contract between Fil-Cartoons and CWC. As in *Vons,* the forum-based relationship between Fil-Cartoons and CWC imposed controls over VMA and required VMA to respond to commands from California to perform additional work, and this forum-based relationship was itself a contributing cause to the injury for which VMA sought compensation. (*Vons, supra,* at p. 457 [relatedness existed because "the contractual contact in California was a contributing cause of the injuries alleged to have been inflicted"].) We conclude under the authority of *Vons* that California has specific jurisdiction over Fil-Cartoons for purposes of adjudicating the claim of VMA.

On appeal, respondents' principal argument asserts that we must affirm the trial court's decision because there was conflicting evidence on various factual issues and substantial evidence supports the trial court's factual determinations. Although there were factual disputes,[11] the jurisdictional facts that we view as determinative were *not* in dispute; only their legal

[11]Respondents' brief catalogues numerous factual disputes that were resolved by the trial court favorably to respondents. Some of the factual disputes identified by respondents— whether Fil-Cartoons' contract with CWC or other California producers created a substantial, continuous and ongoing relationship to confer general jurisdiction and whether the advertising

significance was disputed. Under those circumstances, our review of the ruling is de novo. (*Felix v. Bomoro Kommanditgesellschaft* (1987) 196 Cal.App.3d 106, 111, fn. 5 [241 Cal.Rptr. 670, 69 A.L.R.4th 1].)

## C.   *The Issues on Remand*

We have concluded California has specific jurisdiction over Fil-Cartoons because it purposefully availed itself of the forum benefits by entering into the CWC/Fil-Cartoons contract, and VMA's claim against Fil-Cartoons arose out of or was substantially connected with its forum-based business. VMA also argued below, and reasserts on appeal, that because California has specific jurisdiction over Fil-Cartoons, California may properly assert jurisdiction over its parent corporations under principles of alter ego or agency.

■ The courts have recognized that if a state may exercise jurisdiction over a subsidiary corporation, it may also have jurisdiction over the parent corporation if the elements of the alter ego or principal/agent theories are present. (*Sonora Diamond Corp. v. Superior Court, supra,* 83 Cal.App.4th at pp. 536-537.) When the elements of alter ego are present, the ordinary rule that treats a corporation as separate from its shareholders is disregarded, the court will deem the corporation's acts as the acts of those persons who own and control the entity, and the jurisdiction over the corporation is passed through to its shareholders. (*Id.* at pp. 538-539.) Under the principal/ agent theory, if the forum may assert jurisdiction over the subsidiary, the forum may extend its jurisdiction to the parent if the parent exerts a sufficiently high degree of control over its subsidiary to reasonably deem the subsidiary the agent of the parent under traditional agency principles. (*Id.* at pp. 540-541.)

■ The assertion of jurisdiction under either theory requires a fact-specific examination of numerous elements. The two principal questions to establish alter ego are whether there is "such a unity of interest and owner-ship between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist" and whether there would be "an inequitable result if the acts in question are

done by Fil-Cartoons was worldwide rather than focused on California—are germane to the issue of general jurisdiction but are unnecessary to our evaluation of the propriety of specific jurisdiction. Some of the other factual disputes identified by respondents—where did Fil-Cartoons do its production work for CWC, and whether Barackman's home in California was a "California office" for Fil-Cartoons—are unnecessary to the twin inquiries of purposeful availment and relatedness that are controlling here. Thus, even after giving appropriate deference to the trial court's factual determinations, the present case is one in which the dispositive jurisdictional facts are undisputed, and therefore de novo review of the trial court's ruling is appropriate. (*Vons, supra,* 14 Cal.4th at p. 449.)

treated as those of the corporation alone." (*Sonora Diamond Corp. v. Superior Court, supra,* 83 Cal.App.4th at p. 538.) The courts consider numerous factors, including inadequate capitalization, commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, use of one as a mere conduit for the affairs of the other, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers. (See *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1285 [31 Cal.Rptr.2d 433].) No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine. (*Talbot v. Fresno-Pacific Corp.* (1960) 181 Cal.App.2d 425, 432 [5 Cal.Rptr. 361].) Moreover, even if the unity of interest and ownership element is shown, alter ego will not be applied absent evidence that an injustice would result from the recognition of separate corporate identities, and "[d]ifficulty in enforcing a judgment or collecting a debt does not satisfy this standard." (*Sonora Diamond Corp. v. Superior Court, supra,* 83 Cal.App.4th at p. 539.)

■ Similarly, the principal/agent theory is a fact-driven inquiry that requires examination of whether the parent exercises a sufficient degree of control over its subsidiary to establish that the subsidiary can be described as a means through which the parent acts, or is nothing more than an incorporated department of the parent. Under those circumstances the subsidiary will be deemed to be the agent of the parent in the forum state and jurisdiction will extend to the parent. (*Sonora Diamond Corp. v. Superior Court, supra,* 83 Cal.App.4th at p. 541.) It is the nature of the control exercised by the parent over the subsidiary that is crucial, because some degree of control is an ordinary and necessary incident of the parent's ownership of the subsidiary. Only when the degree of control exceeds this level and reflects the parent's purposeful disregard of the subsidiary's independent corporate existence that the principal/agent theory will be invoked. "As a practical matter, the parent must be shown to have moved beyond the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's *day-to-day* operations in carrying out that policy." (*Id.* at pp. 541-542, original italics.)

Although VMA asserts we may conclude that jurisdiction over Fil-Cartoons' parents is proper under the alter ego or principal/agent theory, the trial court did not reach these issues because it concluded it had no jurisdiction over Fil-Cartoons. Until the parties have litigated and the court determined the factual issues on which either or both of these theories permit the extension of jurisdiction to the parent corporations, we are unable to review the question of whether the application of either theory is supported by the

evidence. (Cf. *Tomaselli v. Transamerica Ins. Co., supra,* 25 Cal.App.4th at pp. 1284-1285.) Accordingly, the alter ego and principal/agent issues must be determined on remand if Fantasia Philippines or FAN elect to renew their motions to quash.

## DISPOSITION

The judgment is reversed and remanded with directions to enter an order denying Fil-Cartoons' motion to quash with prejudice, and denying Fantasia Philippines' and FAN's motions to quash without prejudice. VMA shall recover costs on appeal.

McIntyre, J., and O'Rourke, J., concurred.

A petition for a rehearing was denied July 10, 2002, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied September 11, 2002.