[No. H028516. Sixth Dist. Dec. 15, 2005.]

DOREL INDUSTRIES, INC., Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent.
JONATHAN JACKSON III, a Minor, etc., et al., Real Parties in Interest.

**COUNSEL**

Morgenstein & Jubelirer, Jeffrey R. Williams and Kathleen A. Stimeling for Petitioner.

No appearance for Respondent.

Bohn & Bohn and Robert H. Bohn for Real Parties in Interest Jonathan Jackson III by and through Guardian Ad Litem, Jocelyn Sullivan.

**OPINION**

**McADAMS, J.**—Plaintiff Jonathan Jackson III, a four-year-old child, was severely injured in a motor vehicle accident on December 11, 2003, in Santa Clara County, California. Jackson has filed a personal injury/product liability action against the manufacturer and distributor of the child booster seat he was riding in at the time of the accident, claiming the seat was defective. The defendants include Dorel Juvenile Group, Inc. (DJG), the company that designed, manufactured, and distributed the booster seat, and its grandparent corporation, Dorel Industries, Inc. (DI), a Canadian corporation.

In this statutory writ proceeding, DI challenges the trial court's exercise of personal jurisdiction over the corporation. DI contends that it is merely a grandparent corporation of DJG without sufficient ties to California and that the trial court erred when it found jurisdiction under the "representative services doctrine" and denied DI's motion to quash service of summons. We conclude the exercise of jurisdiction was proper under the representative services doctrine and reasonable under the facts of this case and deny the writ petition.

FACTUAL AND PROCEDURAL HISTORY

## I. *Nature of Lawsuit and Identity of Parties*

The plaintiffs are the child, Jonathan Jackson, and his mother, Jocelyn Sullivan (hereafter jointly plaintiffs). Plaintiffs claim the child booster seat Jonathan was using at the time of the accident, a Cosco Grand Explorer Shield Booster Seat, was defective. Plaintiffs claim the child's upper body was not properly restrained because of the design of the seat. As a result of the accident, the child fractured his neck at C-2. He is a quadriplegic. He is in a coma/vegetative state and claims a brain injury.

Defendants that were named in the original complaint include: (1) DJG, the company that designed, manufactured, and distributed the booster seat; (2) Cosco Home and Office Products, DJG's corporate predecessor; (3) Wal-Mart Stores, Inc. (Wal-Mart), the retailer that sold the booster seat; and (4) Talyon J. Orr, the driver of the car. The complaint was amended to add petitioner DI, a Canadian corporation, as Doe One. DJG, Wal-Mart, and Orr have appeared and are defending the action.

## II. *Relationship Between Dorel Defendants*

DJG is a Massachusetts corporation with its principal place of business in Indiana. DJG is owned by Dorel U.S.A., Inc. (Dorel-USA), a Delaware

corporation with its principal place of business in Indiana. Dorel-USA has not been named in the litigation. Petitioner DI was incorporated in Quebec, Canada and maintains its principal place of business in Montreal. DJG is a wholly owned subsidiary of Dorel-USA, which is a wholly owned subsidiary of DI.

## III. *History and Business of DI*

DI was founded by Leo Schwartz, his wife, and his son, Jeff Schwartz, in 1962. DI designed and manufactured child restraints and other juvenile products for the Canadian market only. In 1987, DI merged with Ridgewood Industries, a Canadian corporation that manufactured ready-to-assemble (RTA) furniture. Ridgewood Industries was owned by Leo Schwartz's sons, Alan Schwartz and Martin Schwartz, and his son-in-law, Jeff Segel. That same year, DI made an initial public offering in Canada and became a publicly owned company.

In 1988, DI purchased Cosco, Inc. (corporate predecessor of DJG), a leading manufacturer of child restraints in the United States. Before its acquisition of Cosco, DI did not distribute its products in the United States. DI believed the purchase of Cosco would open a large juvenile market in the United States. DI "grew" its market by acquiring Cosco as a subsidiary with the intent of enhancing shareholder value. As noted below, by 2003, 73 percent of DI's sales, including those of its subsidiaries, were in the United States.

After acquiring Cosco, DI continued to manufacture juvenile products, including car seats, in Canada for a few years. In 1995 or 1996, DI stopped designing and manufacturing its own restraints and began importing Cosco's restraints to Canada for sale to its Canadian customers. Thereafter, its juvenile products were designed and manufactured at Cosco in the United States for sale in both the United States and Canadian markets. In 2000, DI acquired Safety 1st, a manufacturer of juvenile safety devices (safety gates, locks, etc.) and merged Safety 1st and Cosco to form DJG. DJG continued the Cosco business of manufacturing and designing child safety seats for the United States market and for import to DI in Canada.

Over the years, DI has acquired a number of subsidiaries in North America, Europe, Barbados, and Hong Kong. As of December 2003, the Dorel Industries, Inc., group consisted of five companies in the United States (including DJG), two companies in Canada, 13 companies in Europe, three companies in Barbados, and two in Hong Kong. DI describes itself as "a publicly-owned corporation" that is "both a Canadian operating company" and "a parent holding company of several foreign subsidiaries." According to DI, "as the parent holding company to its United States subsidiaries, [DI]

provides basic structural services, such as arrangements for financing, insurance, and procurement. In turn, DI's foreign subsidiaries focus their efforts on designing, manufacturing, marketing, and distributing quality products."

DI's business as a Canadian operating company includes the sales of juvenile products it purchases from DJG to customers in Canada. The products are sold through DJG-Canada. DJG-Canada is a division of DI and not a separate subsidiary company. DI states: "There are differences in the way companies affiliate in Canada, and DI has elected to run its Canadian operations through a system of divisions rather than separate subsidiaries. One of these divisions, DJG-Canada, imports DJG's child restraints for distribution in Canada."

In December 2003, DI stated the following in its annual report filed with the Securities and Exchange Commission (SEC): "Dorel[1] is a global manufacturer of consumer products. It specializes in two market segments: juvenile products and home furnishings. Dorel's extensive product offering includes juvenile products such as infant car seats, strollers, high chairs, toddler beds, cribs, infant health and safety aids, play-yards and juvenile accessories; and home furnishings such as a wide variety of [RTA] furniture for home and office use, as well as metal folding furniture, futons, step stools, ladders and other imported furniture items." DI also reported: "Historically, [DI's] business was carried out through three operating segments: RTA Furniture, Juvenile Products and Home Furnishings. [¶] In 2003, the Company changed the way in which it reports results from its operating segments. The RTA Furniture and Home Furnishings Segments were combined into one segment that is referred to as Home Furnishings." In 2003, the juvenile products segment accounted for 57.6 percent of sales and the home furnishings segment accounted for 42.4 percent of sales. Operating profits from the juvenile products segment were $65.9 million; operating profits from the home furnishings segment were $66.8 million. In 2003, 73 percent of DI's sales took place in the United States, 3 percent in Canada, and 24 percent in Europe and elsewhere. As of December 2003, DI employed approximately 5,000 people in 14 countries.

## IV. *Motion to Quash*

Plaintiffs filed their complaint in February 2004. They amended the complaint in June 2004 and added DI as a Doe defendant. In September 2004, DI moved to quash service of summons on the grounds that DI was not subject to suit in California because the court did not have personal jurisdiction over DI. DI argued plaintiffs could not establish general jurisdiction

---

[1] The report defined "Dorel" as DI and its subsidiaries.

because DI was a Canadian corporation that had insufficient contacts with California. It asserted that DI did not have any employees, real property, or bank accounts in California and that it did not pay taxes or maintain a registered agent for service of process in California. DI also contended the court could not exercise specific jurisdiction over it because the necessary nexus between the litigation, the forum, and the defendant did not exist. It argued that exercising jurisdiction over DI offended traditional notions of fair play and substantial justice.

Plaintiffs opposed the motion. They argued the court had general jurisdiction over DI based upon its widespread activities in California and under the representative services doctrine, a variant of agency theory that is used as a basis for general jurisdiction over a foreign parent corporation. (See *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 542–545 [99 Cal.Rptr.2d 824] (*Sonora Diamond*).) Plaintiffs maintained the court had specific jurisdiction over DI because DI had purposefully availed itself of the benefits of conducting business in the forum by distributing its products in California and by signing a lease guarantee on behalf of Dorel-USA and procuring insurance coverage for Dorel-USA on a warehouse located in Ontario, California.

The trial court found general jurisdiction over DI under the "representative services" doctrine and denied the motion to quash. The court reasoned that DJG performs a function that is compatible with and assists DI in its own business, the importation and sale of child car seats. The court noted that although DI no longer manufactures car seats itself, it purchased other companies to provide that service and sell those products in the United States, including California. The trial court did not reach the parties' arguments regarding specific jurisdiction.

After the court denied its motion to quash, DI filed a petition for writ of mandate or prohibition in this court. Writ review of an order denying a motion to quash service of summons is available pursuant to Code of Civil Procedure section 418.10, subdivision (c). DI seeks an order directing the trial court to vacate its order denying the motion to quash service of summons on the grounds that it does not have the requisite minimum contacts with California. Plaintiffs, real parties in interest, filed preliminary opposition and DI filed a reply. We subsequently issued an order to show cause. Plaintiffs elected to treat their preliminary opposition as a written return and there has been no further briefing.

## Discussion

### I. Summary of Petitioner's Arguments

DI contends the trial court erred in finding general jurisdiction under the representative services doctrine. Petitioner also asserts that the court does not have specific jurisdiction over DI and that the exercise of jurisdiction over DI does not conform with notions of fair play and substantial justice. DI asks this court to issue a writ of mandate directing the trial court to quash service of summons on DI.

### II. Standard of Review

When a nonresident defendant challenges personal jurisdiction, the plaintiff must prove, by a preponderance of the evidence, the factual basis that would justify the exercise of jurisdiction. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 449 [58 Cal.Rptr.2d 899, 926 P.2d 1085] (*Vons*); *Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 273 [127 Cal.Rptr.2d 329, 58 P.3d 2] (*Pavlovich*).) If the plaintiff meets this burden, it is then up to the defendant to show that the exercise of jurisdiction would be unreasonable. (*Pavlovich*, *supra*, 29 Cal.4th at p. 273.) In this analysis, the merits of the complaint are not implicated. (*Sonora Diamond*, *supra*, 83 Cal.App.4th at p. 540.)

On review, the question of jurisdiction is, in essence, one of law. When the facts giving rise to jurisdiction are conflicting, the trial court's factual determinations are reviewed for substantial evidence. (*Sonora Diamond*, *supra*, 83 Cal.App.4th at p. 540.) Even then, we review independently the trial court's conclusions as to the legal significance of the facts. (*Vons*, *supra*, 14 Cal.4th at p. 449; *VirtualMagic Asia, Inc. v. Fil-Cartoons, Inc.* (2002) 99 Cal.App.4th 228, 243–244 [121 Cal.Rptr.2d 1].) When the jurisdictional facts are not in dispute, the question of whether the defendant is subject to personal jurisdiction is purely a legal question that we review de novo. (*Sonora Diamond*, *supra*, 83 Cal.App.4th at p. 540.)

### III. Basic Principles of Jurisdiction

The basic principles courts apply in analyzing jurisdiction are well known. They are set forth in *Sonora Diamond* as follows: "Code of Civil Procedure section 410.10 permits California courts to exercise jurisdiction on any basis not inconsistent with state or federal constitutional principles. The federal constitutional principles governing jurisdiction, represented by the legal

shorthand references *minimum contacts*, *Internat[ional] Shoe*, and *World-Wide Volkswagen* familiar to every law student, are simple to state but difficult to apply. The overarching general rule is that a court may assume jurisdiction over a nonresident defendant where the defendant's 'minimum contacts' with the forum state are sufficient to make the maintenance of the action inoffensive to traditional concepts of fair play and substantial justice. (*Internat. Shoe Co. v. Washington* (1945) 326 U.S. 310, 320 [66 S.Ct. 154, 90 L.Ed. 95].) Thus, minimum contacts exist where the defendant's conduct in or connection with the forum state is such that the defendant should reasonably anticipate being subject to suit in the state (*World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, 297 [100 S.Ct. 559, 62 L.Ed.2d 490]); that is, the defendant's contacts with the forum state are substantial, continuous and systematic (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 445 [58 Cal.Rptr.2d 899, 926 P.2d 1085]). 'The sufficiency of such contacts [to support jurisdiction] is a matter of constitutional law on which the Supreme Court of the United States has the final voice. A judgment rendered in the absence of such [contacts] violates the due process clause of the Fourteenth Amendment.' [Citations.] When the defendant is a foreign corporation, the question whether 'jurisdiction may be constitutionally exercised depends upon the circumstances of each individual case. . . . [T]he analysis is concerned with weighing the various relevant "contacts" by the foreign corporation within the state attempting to exercise jurisdiction.' [Citation.]" (*Sonora Diamond, supra*, 83 Cal.App.4th at pp. 535–536.)

"The concept of minimum contacts embraces two types of jurisdiction—general and specific. General jurisdiction results where the defendant's contacts with the forum state are so 'systematic and so continuous as to make it consistent with traditional notions of fair play and substantial justice to subject the defendant to the jurisdiction of the forum, even where the cause of action is unrelated to the contacts.' [Citations.] Specific jurisdiction results when the defendant's contacts with the forum state, though not enough to subject the defendant to the general jurisdiction of the forum, are sufficient to subject the defendant to suit in the forum on a cause of action related to or arising out of those contacts. [Citations.] *Specific* jurisdiction exists if: (1) the defendant has purposefully availed itself of forum benefits with respect to the matter in controversy; (2) the controversy is related to or arises out of the defendant's contacts with the forum; and (3) the assertion of jurisdiction would comport with fair play and substantial justice." (*Sonora Diamond, supra*, 83 Cal.App.4th at p. 536.) In this case, the court concluded there was general jurisdiction under the representative services doctrine and did not reach the issue of specific jurisdiction.

In cases involving international defendants, the procedural and substantive interests of other nations in a state court's assertion of jurisdiction, as well as "the Federal Government's interests in its foreign relations policies, will be best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the particular case, and an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State. 'Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.' [Citation.]" (*Asahi Metal Industry Co. v. Superior Court* (1987) 480 U.S. 102, 115 [107 S.Ct. 1026, 94 L.Ed.2d 92].)

## IV. *General Jurisdiction Based on Agency Principles*

"[A] parent corporation's formation and ownership of an independent subsidiary for the purpose of conducting business in the forum state does not itself subject the parent to jurisdiction in that state." (*Sonora Diamond, supra,* 83 Cal.App.4th at p. 546.) "[N]either ownership nor control of a subsidiary corporation by a foreign parent corporation, without more, subjects the parent to the jurisdiction of the state where the subsidiary does business." (*Id.* at p. 540.) " 'Control' in this context means the degree of direction and oversight normal and expected from the status of ownership; it comprehends such common characteristics as interlocking directors and officers, consolidated reporting, and shared professional services. [Citations.] The relationship of owner to owned contemplates a close financial connection between parent and subsidiary and a certain degree of direction and management exercised by the former over the latter." (*Id.* at pp. 540–541.)

Case law identifies one situation when the acts of the parent may be found to cross the line of legitimate ownership and control of the subsidiary and expose the parent corporation to the power of the state in which the subsidiary does business. "[W]here the nature and extent of the control exercised over the subsidiary by the parent is so pervasive and continual that the subsidiary may be considered nothing more than an agent or instrumentality of the parent, notwithstanding the maintenance of separate corporate formalities, jurisdiction over the parent may be grounded in the acts of the subsidiary/agent. [Citation.] In this instance, the question is . . . whether the degree of control exerted over the subsidiary by the parent is enough to reasonably deem the subsidiary an agent of the parent under traditional agency principles. [Citation.] The jurisdiction acquired by the forum state under this rationale is general." (*Sonora Diamond, supra,* 83 Cal.App.4th at p. 541, fn. omitted.)

"[I]f a parent corporation exercises such a degree of control over its subsidiary corporation that the subsidiary can legitimately be described as only a means through which the parent acts, or nothing more than an incorporated department of the parent, the subsidiary will be deemed to be the agent of the parent in the forum state and jurisdiction will extend to the parent." (*Sonora Diamond, supra*, 83 Cal.App.4th at p. 541.)

"The parent's general executive control over the subsidiary is not enough; rather there must be a strong showing beyond simply facts evidencing 'the broad oversight typically indicated by [the] common ownership and common directorship' present in a normal parent-subsidiary relationship. [Citations.] As a practical matter, the parent must be shown to have moved beyond the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's *day-to-day* operations in carrying out that policy." (*Sonora Diamond, supra*, 83 Cal.App.4th at p. 542.)

There was evidence that the executive committee of DI conducted annual budget meetings with representatives of DJG to monitor the status of their investment. Members of DI's executive committee also visited with their subsidiary's (DJG's) major customers, accompanied by sales executives from the subsidiary approximately once a year per customer. There was also evidence that some DI employees and executives attended sales and product development meetings at DJG to obtain information regarding products that were coming to market for sale in Canada. In addition, members of DI's board of directors received copies of the minutes from DJG's product development committee meetings. Two individuals on the DI board of directors also served on the board of DJG. DI submitted a company-wide report to the SEC that summarized the activity of DI and all of its subsidiaries. DI also guaranteed the lease and provided insurance coverage for Dorel-USA on a warehouse located in California. Although Dorel-USA is listed as the tenant on the lease, there was evidence that DJG actually used the warehouse and was the tenant. DI obtained a license from the California Bureau of Home Furnishings and Thermal Insulation. None of this appears to be outside the normal parent-subsidiary relationship. (*Sonora Diamond, supra*, 83 Cal.App.4th at pp. 546–551.)

On the other hand, there was evidence that DJG operated independently from DI. In declarations, two of DI's directors stated that DI and DJG maintained separate corporate records and observed all corporate formalities, that DI did not exercise day-to-day control over DJG's personnel, accounting, or management functions or its operational activities, including the design, manufacture, marketing and distribution of child car seats. Overall, the record

does not support the conclusion that DI had taken over the day-to-day operations of DJG. Thus, there is no basis for finding jurisdiction on an agency theory.

## V. *The Representative Services Doctrine as a Variant of Agency Theory*

The representative services doctrine is a variant of the agency theory of general jurisdiction. (*Sonora Diamond, supra,* 83 Cal.App.4th at p. 543, fn. 11.)

A foreign corporation is doing business in the forum state under this theory when its representative in the forum state " 'provides services beyond "mere solicitation" and these services are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.' " (*Chan v. Society Expeditions, Inc.* (9th Cir. 1994) 39 F.3d 1398, 1405 (*Chan*).) It "supports the exercise of jurisdiction when the local subsidiary performs a function that is compatible with, and assists the parent in the pursuit of, the parent's *own* business, but the doctrine does not support jurisdiction where the parent is merely a holding company whose only business pursuit is the investment in the subsidiary." (*Sonora Diamond, supra,* 83 Cal.App.4th at p. 543.)

" '[I]f a parent uses a subsidiary to do what it otherwise would have done itself, it has purposely availed itself of the privilege of doing business in the forum. Jurisdiction over the parent is therefore proper. [Citations.] This contrasts to the case of a holding company. In such a case, the subsidiary is not performing a function that the parent would otherwise have had to perform itself (the holding company could simply hold another type of subsidiary). In such a case, imputing jurisdictional contacts would be improper.' " (*Sonora Diamond, supra,* 83 Cal.App.4th at p. 543.)

A review of cases that have applied the representative services doctrine is instructive. The plaintiff in *Chan* sued for damages for personal injury arising out of the capsizing of an inflatable raft operating from a cruise ship. The parent company was a German corporation that owned and operated the cruise ship but had no contacts with the forum state (Washington). The local corporation/subsidiary was in the business of marketing cruises and was responsible for chartering the cruise ship from which the raft operated. A German citizen was the sole shareholder, chairperson, and president of the

local corporation/subsidiary and the president and sole owner of the parent corporation. The Ninth Circuit Court of Appeals found that the representative services doctrine might sustain jurisdiction over the parent based upon the activities of the local corporation because the parent "is in the business of operating the [cruise ship], has no other business than the carriage of passengers, and the passengers were obtained, ticketed, and supplied with cabins solely through the efforts of [the local corporation]." (*Chan, supra,* 39 F.3d at p. 1405.)

In an analogous situation, the court in *Paneno v. Centres for Academic Programmes Abroad Ltd.* (2004) 118 Cal.App.4th 1447 [13 Cal.Rptr.3d 759] affirmed a finding of general jurisdiction based on the representative services doctrine over a British company that administered foreign studies programs and contracted with various entities in foreign countries to house students studying abroad. The court based the exercise of jurisdiction on the activities of the company's California affiliate that marketed and recruited students for the foreign studies programs. (*Id.* at pp. 1451–1452.) The court reasoned that the British entity was not just a holding company but was itself engaged in business operations that were closely connected to the local entity, which performed functions solely to assist the British company in its business. (*Id.* at pp. 1456–1457.)

In *Sonora Diamond*, the court concluded that there was no jurisdiction under the representative services doctrine where the foreign parent corporation was merely a passive investor in a local mining company. The court observed that the parent company "engaged in no independent business operations, whether connected to mining or not." (*Sonora Diamond, supra,* 83 Cal.App.4th at p. 544.) The parent was a holding company whose business was not mining but rather its investment in Sonora Mining, the subsidiary. The court concluded the subsidiary was not " 'performing a function that [the parent] would otherwise have had to perform itself.' " (*Id.* at p. 545.) The court reasoned that had the parent "for example, owned the rights to the gold and used Sonora Mining as the operating and marketing entity, perhaps general jurisdiction over [the parent] would be proper under the representative services rationale, because [the parent] in that situation could not reap the benefits of its rights unless it or someone else removed and sold the ore. Neither this circumstance, nor any analogous one, is present in the record of this case. [The parent corporation] was not engaged in the mining business and owned nothing but the stock of [the subsidiary]." (*Ibid.*)

This court recently addressed the application of the representative services doctrine in a case involving jurisdiction over two Swiss drug companies in *F. Hoffman-La Roche v. Superior Court* (2005) 130 Cal.App.4th 782 [30 Cal.Rptr.3d 407] (*Hoffman-La Roche*). In *Hoffman-La Roche*, there was no evidence that the first Swiss drug company was "anything other than a true passive holding company that globally invests in pharmaceutical subsidiaries." (*Id.* at p. 802.) Thus, we concluded based on *Sonora Diamond* that there was no jurisdiction under the representative services doctrine. (*Ibid.*)

With regard to the second Swiss company, the record did not establish either that it "exercised pervasive and continuous control over the business of either of the U.S. . . . . defendants so as to establish a general agency relationship, or that the U.S. entities acted as mere instrumentalities of [the foreign corporation] in the furtherance of *its* business to invoke jurisdiction under the representative services doctrine." (*Hoffman-La Roche, supra*, 130 Cal.App.4th at p. 802.) This court held that the collaborative activity between the Swiss entity and the United States defendants relating to the collection, evaluation, and reporting of adverse drug events did not extend beyond normal operational control between a parent and a subsidiary and that the operational activities of the United States subsidiaries were not in furtherance of the Swiss company's business, thus precluding application of the representative services doctrine. (*Id.* at p. 803.) We also concluded that the exercise of jurisdiction over the Swiss defendants based solely on their collaborative and global efforts to create a more efficient, more responsive, and safer system for monitoring and reporting adverse drug events associated with prescription drugs worldwide was unreasonable. (*Id.* at p. 805.)

In this case, the trial court found the representative services doctrine applies because DJG performs a function that is compatible with and assists DI in the pursuit of DI's own business, the sale of juvenile products, including car seats. The court reasoned that DI imports and sells child car seats manufactured by its subsidiary, DJG, and that it purchased DJG to provide that service and expand its market into the United States.

DI contends the court erred in finding jurisdiction under the representative services doctrine because there was no evidence that DJG performed acts that DI otherwise would have had to perform itself. However, it was undisputed that DJG manufactured juvenile products that DI had previously manufactured itself for sale to DI's Canadian customers. DI argues that it never sold its products in California before acquiring DJG. It contends that although it

could have tried to break into the California market itself, it elected to invest in DJG for the purpose of expanding into the United States. It argues that any business in California belongs to DJG, not DI, and that DJG works independently of DI, designing, manufacturing, and distributing its own products.

 This case is factually distinguishable from *Sonora Diamond* and *Hoffman-La Roche* since there was evidence that in addition to operating as a holding company and investing in subsidiary companies, DI continued its traditional business of manufacturing and distributing juvenile products in Canada, including car seats, and that it relied on DJG to design and manufacture those car seats. In addition, DI worked closely with DJG to ensure that the car seats met the requirements of the Canadian government with regard to safety and labeling and the demands of the Canadian marketplace in terms of style. This work was done by DJG-Canada, a division of DI that was not a separate subsidiary company. There was also evidence that DJG-Canada got involved in customer service issues related to DJG products that were manufactured in the United States and distributed in Canada. Thus, there was evidence that DJG, the Indiana subsidiary over which there is no dispute as to jurisdiction, performed functions that were compatible with and assisted the parent company (DI) in the pursuit of the parent's own business as a Canadian operating company. In this case, the Canadian parent company used its United States subsidiary to design and manufacture the car seats, a task it otherwise would have done itself, to meet the demands of its Canadian customers. In this respect, the case is much more like *Chan* and *Paneno* than *Sonora Diamond*. Thus, this case meets the requirements for the exercise of general jurisdiction under the representative services doctrine. (*Sonora Diamond, supra,* 83 Cal.App.4th at p. 543.)

## VI. *Reasonableness of Exercising Jurisdiction*

The final step in the analysis is to determine whether the exercise of jurisdiction is reasonable. As noted previously, DI has the burden of proving the exercise of jurisdiction is unreasonable. (*Vons, supra,* 14 Cal.4th at p. 449.) "A determination of the reasonableness of the exercise of jurisdiction in a given case involves evaluation of several factors: the burden on the defendant, the interests of the forum state, and the plaintiff's interest in obtaining relief. (*Asahi Metal, supra,* 480 U.S. 102, 113.) A court must also weigh ' "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies." [Citation.]' (*Asahi Metal, supra,* 480 U.S. at p. 113.) Where an international defendant is concerned, a

court must also 'consider the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction by the California court.' (*Asahi Metal*, *supra*, 480 U.S. at p. 115.)" (*Hoffman-La Roche*, *supra*, 130 Cal.App.4th at p. 805.)

DI contends the exercise of jurisdiction is unreasonable and offends traditional notions of fair play and substantial justice because it "has no significant relationship with California—it owns no office or real property in California, conducts no advertising in California, and has no bank accounts, business records, or agent for service of process in California." It asserts further that DI could not have anticipated being haled into a California court because of an isolated traffic accident involving a child restraint produced by its subsidiary. DI argues that the harassment of a foreign grandparent corporation that owns the stock of another holding company (Dorel-USA) that owns the stock of the wrongdoer (DJG) serves no societal or judicial interest consistent with notions of fair play and substantial justice. It asserts also that the plaintiffs possess a remedy against the wrongdoers, DJG and Wal-Mart, who have appeared in the action. It argues that allowing a California court to impose judgment against a Canadian corporation that has only negligible ties to the forum disparages international comity. Plaintiffs do not address this issue.

Nothing in this record suggests that DJG is uninsured or unable to respond in damages in the event the trier of fact finds liability. As noted before, DJG and Wal-Mart have appeared in the action and are represented by counsel. The same attorneys who represent DJG and Wal-Mart represent DI in these writ proceedings. Assuming the same lawyers will represent DI in defense of the case, the cost of defending the action would be shared by DJG and DI, resulting in some efficiencies and cost saving. Having all of the potentially liable defendants appear in the same forum in California will allow for the most efficient resolution of plaintiffs' claims and avoid the risk of inconsistent judgments attendant to pursuing multiple proceedings in different forums. If plaintiffs prevail on liability, the damages will be high, given the nature of the child's injuries. There is nothing in the record regarding the effect of this litigation on the procedural and substantive policies of Canada. With these points in mind, we hold the exercise of jurisdiction over the Canadian corporation in this case was not unreasonable.

For all of the foregoing reasons, we conclude the court did not err when it denied DI's motion to quash service of summons.

DISPOSITION

The writ petition is denied. Real parties in interest are awarded their costs in this original proceeding.

Premo, J., and Rushing, P. J., concurred.

Petitioner's petition for review by the Supreme Court was denied March 1, 2006, S140687. Chin, J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.