[Civ. No. 21039.   First Dist., Div. One.   Sept. 26, 1963.]

PETER T. POPE et al., Plaintiffs and Appellants, v. NATIONAL AERO FINANCE CO., INC., Defendant and Respondent.

William M. Brinton for Plaintiffs and Appellants.

John Felton Turner for Defendant and Respondent.

MOLINARI, J.—This is an appeal by plaintiffs from an order of the superior court quashing service of summons on defendant, National Aero Finance Co., Inc.,[1] a Kansas corporation. ▉ The sole question on appeal is whether said defendant was doing business in this state so as to subject it to local process.

The procedural background is as follows: Plaintiffs filed a complaint in the Superior Court of San Mateo County against Harper Aviation Sales, Inc.,[2] a California corporation, and Nafco to set aside certain alleged fraudulent conveyances. Plaintiffs allege in said complaint, in essence, that they were creditors of Harper at a time when Harper was the owner of nine airplanes; that while they were such creditors Harper became indebted to Nafco; that Harper executed chattel mortgages on said airplanes as security for its obligations to Nafco; that the obligations to Nafco were incurred by Harper at a time when the latter was insolvent or was thereby rendered insolvent; and that said obligations were incurred without a fair consideration. Accordingly, plaintiffs seek to set aside the chattel mortgages on said airplanes as being in fraud of creditors. Nafco was served with summons and complaint in said action pursuant to an order of court directing service to be made in accordance with the

---

[1]Hereinafter referred to as Nafco.
[2]Hereinafter referred to as Harper.

provisions of section 411 of the Code of Civil Procedure and section 6501 of the Corporations Code.[3] This order was made on the basis of an affidavit by plaintiffs' attorney which stated that Nafco was doing business in California. Nafco appeared specially and filed its motion to quash summons on the ground that it was not doing business in California and that therefore the court did not have jurisdiction. The motion was supported by affidavits. The court below granted the motion and quashed the summons on the ground that Nafco was not doing business in California.

■ Whether the service of process upon Nafco was valid depends upon whether it was "doing business in this State" within the meaning of Code of Civil Procedure section 411, subdivision 2, the term "doing business" being " 'synonymous [in California] with the power of the state to subject foreign corporations to local process.' " (*Cosper* v. *Smith & Wesson Arms Co.*, 53 Cal.2d 77, 82 [346 P.2d 409]; *Empire Steel Corp.* v. *Superior Court*, 56 Cal.2d 823, 828-829 [17 Cal.Rptr. 150, 366 P.2d 502].) ■ Accordingly, the case at bench turns upon the meaning of the term "doing business." The meaning of this terminology as distilled from the cases is stated by our Supreme Court in *Empire Steel*, as follows: " [W]hether or not a foreign corporation is doing business within this state and is subject to the jurisdiction of our courts depends upon the limits for such jurisdiction as determined by our statutory and constitutional provisions, which in turn are subject to applicable federal constitutional guarantees, especially the due process guarantee of the Fourteenth Amendment. [Citation.] The problem of jurisdiction over a foreign corporation is therefore a combined state and federal question. [Citation.] ... ■ [T]he term 'doing business' is a descriptive one that the courts have equated with such minimum contacts with the state 'that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice.' " [Citation.] ... ■ Whether a foreign corporation is doing business within this state so

---

[3]Code of Civil Procedure section 411, subdivision 2, provides that in a suit against a foreign corporation, doing business in this state, summons must be served by delivering a copy thereof in the manner provided for by sections 6500 to 6504, inclusive, of the Corporations Code. These sections of the Corporations Code provide for the methods of effecting service of process on foreign corporations. Section 6501, which was utilized in the instant action, provides for the instances in which service may be made upon the Secretary of State.

that jurisdiction may be constitutionally exercised depends upon the circumstances of each individual case. [Citations.] . . . [T]he analysis is concerned with weighing the various relevant 'contacts' by the foreign corporation within the state attempting to exercise jurisdiction. [Citation.]'' (Pp. 829, 831.)

In the light of the foregoing principles and subject to the rule that the burden of proving that a foreign corporation is "doing business" in this state is upon the plaintiff (*Yeck Mfg. Corp.* v. *Superior Court*, 202 Cal.App.2d 645, 649 [21 Cal.Rptr. 51]; *Martin Bros. Elec. Co.* v. *Superior Court*, 121 Cal.App.2d 790, 794 [264 P.2d 183]), we proceed to analyze the facts of the instant case to determine whether Nafco has had the requisite "minimum contacts" within this state. Nafco is a wholly owned subsidiary of the Cessna Aircraft Company of Wichita, Kansas. The business of Nafco is to finance the purchases of airplanes by Cessna distributors from the Cessna factory or purchases of airplanes by Cessna dealers from their distributor or Cessna factory, whichever is appropriate, and to finance purchases made by third persons from Cessna dealers. Thus, two distinct types of transactions are financed by Nafco, wholesale and retail. Purchases by Cessna distributors from the Cessna factory and purchases by dealers from their distributor or the Cessna factory are classified as wholesale transactions. Purchases by third persons from Cessna dealers are classified as retail transactions. The financing of retail sales is subject to a written agreement between Nafco and the particular dealer involved. The financing of wholesale transactions is controlled solely by the actual financing contract involved. Pursuant to the above mode of operation, in the period between January 1959 and February 1962, Nafco directly or indirectly financed or participated in the financing of 412 aircraft purchased within California or by residents of California. Of these 412 transactions, 369 were wholesale, and 43 were retail. The said retail transactions represented financing aggregating in excess of $550,000. Ten of these airplanes were purchased by Harper.

The business represented by Nafco's financing of the purchase of aircraft above mentioned within California or by residents of California was produced by making its financing program known to Cessna dealers and distributors in California primarily through the mails; and on two or three occasions, by the appearance of Nafco personnel at Cessna

dealer meetings in California. Nafco representatives make one or two visits a year to California in connection with the financing program. Nafco also participates, on occasion, in meetings in Wichita, at which representatives of dealers from California may be present.

Applications for financing are made by the dealer or distributor to Nafco in Wichita by mail, telegram or telephone, and all applications are subject to acceptance at Wichita. Except for Nafco's transactions with Harper, to which we shall hereinafter specifically refer, the record is void of description of the manner in which the documents relative to the financing transactions are handled and executed.

During the years 1960 and 1961, Mr. E. D. Chase, vice president of Nafco, made a total of five trips to California. On the first trip he attended dealer meetings in Long Beach and Oakland to introduce and explain Nafco's new retail finance plan. On the second he attended meetings of Cessna dealers and dealer personnel without participation by Nafco. The third and fourth trips were relative to the situation at Harper and to protect the interests of Nafco. The fifth trip was primarily for the purpose of delivering a lecture in Fresno sponsored by the University of California. On the first three trips Chase also made courtesy calls on several accounts throughout California; on the last four of the five trips he also called on a total of five dealers and one retail customer relative to their accounts. These trips are the only ones made by Nafco employees to California during the period involved. Nafco does not maintain any officer or resident representative or other employee residing or employed in California. Nor does it have a California bank account, telephone, business listing, property or other assets within the State of California.

When payments under a finance contract are delinquent Nafco uses a routine notice, letter, telegram, telephone call, and occasionally a personal visit by a Nafco representative, in order to effect collection. If all other efforts to collect on a delinquent account fail, physical repossession is effected by an officer, employee or representative of Nafco. When it is necessary to repossess an airplane this aircraft is then sold by Nafco. The actual negotiation for the sale is conducted by the person who physically repossesses the airplane, or it may be conducted by some other officer, employee or representative of Nafco. Such airplanes may be sold in the same state in which

they are repossessed or in any other state. All bills of sale are completed in Wichita and the terms of such sale are subject to approval at Wichita. The aforementioned repossession and sale procedure is followed in California, as well as in other states. During the period from January 1, 1959, to February 15, 1962, Nafco physically repossessed 14 airplanes in the State of California.[4] Thirteen of these airplanes were resold to residents of California. Three were sold for cash, nine were sold under a finance contract, and one was repurchased by a dealer under his financing agreement.

Between January of 1959 and November of 1960, Nafco financed the purchase by Harper, a Cessna aircraft dealer, of 10 aircraft. As alleged in one of the affidavits in support of the motion, promissory notes and chattel mortgages on these aircraft were made, executed and delivered at Wichita, Kansas. One of these chattel mortgages is a part of the record before us. It bears a form of acknowledgment which purports to show that its execution was acknowledged before a notary public in Kansas by one James P. Kiniry, as attorney in fact for Harper. Subsequently, and on or about March 28, 1961, Nafco agreed with Harper at Wichita, Kansas, to refinance nine of the aforesaid 10 airplanes, extending time for payments thereon, and received and accepted from Harper at Wichita new and substitute promissory notes and chattel mortgages on each of said aircraft. All of these notes bear the date of March 28, 1961. Only one of these chattel mortgages is part of the record before us. It bears the date of March 28, 1961, and a form of acknowledgment which purports to show that its execution was acknowledged before a notary public in San Mateo, California, by Howard S. Harper, president of Harper. Harper thereafter became delinquent in the payment of installments of interest and principal due and payable under each of said promissory notes secured by the said chattel mortgages. On May 24, 1961, Nafco declared the entire balance upon each of said promissory notes to be due and payable, and, pursuant to the provisions of said chattel mortgages, exercised its right to take immediate possession of the said nine airplanes. Chase came to California, where he physically took possession of said nine airplanes which he then sold and disposed of in California. Two successive writs of attachment had been levied on one of these airplanes necessitating the presentation by

---

[4]These included the nine airplanes which are the subject of this litigation and which are hereinafter referred to.

Nafco of third party claims, in each instance, in California courts pursuant to the laws of California in order to secure a release and discharge of said attachments.

On May 24, 1961, plaintiffs filed an action[5] against Harper for the sum of $15,305.80, and on August 31, 1961, obtained a consent judgment against Harper in that amount. Thereafter, on February 15, 1962, the instant action was filed by plaintiffs against Harper and Nafco.

Consonant with the foregoing principles, as applied and interpreted by the reviewing courts, we are persuaded that Nafco maintained substantial contacts within this state through a course of regularly established business activity so as to make it amenable to local process and jurisdiction. These contacts were not isolated or casual instances of business activity but incidents of a systematic course of commercial transactions in this state. From January 1959 to February 1962, Nafco financed a total of 412 aircraft purchased within California or by residents of California. It exercised a systematic course of communication with Cessna dealers in California relative to its financing procedures. Its representatives have attended dealer meetings in California on occasions relative to its financing program, and at least one visit in this regard is made annually. During the years 1960 and 1961 its vice president made five visits to California and on each occasion transacted business on behalf of his company. While the record is unclear as to where and how the promissory notes and chattel mortgages were prepared and executed, the applications for financing were initiated by Cessna dealers in California and then transmitted by them to Kansas for approval and acceptance. This was part of the systematic financing program arranged by Nafco with these dealers, and maintained by regular contact through the mails and other media of communication. We are not here concerned, moreover, with the niceties of the law as to the forum wherein a contract is deemed to have been entered into or where it is to be performed, but rather with the nature and extent of the commercial dealings in this state. We are impressed, furthermore, with Nafco's activity in this state when it became necessary to repossess airplanes pur-

[5] The gist of the action was that Harper sold to each of the plaintiffs one share in the San Carlos Flying Club for the aggregate sum of $15,305.80, and that contemporaneously with said sale Harper falsely represented that said club was the owner of a Cessna airplane, the title to which had been transferred from Harper to said club.

chased by residents of California. Not only was it the policy of Nafco to send its representative to California to *physically* repossess such aircraft, but to actively engage in the *sale* of the repossessed airplane in this state. This policy was carried out on numerous occasions and was particularly carried out with respect to all of the nine airplanes which are involved in the instant litigation. It is also abundantly clear that, when necessary, Nafco resorted to the aid of California courts in order to effect and facilitate such repossession.

The minimum contact test emanates from the landmark case of *International Shoe Co.* v. *Washington* (1945) 326 U.S. 310 [66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057]. *International Shoe Co.* declares that the presence theory expounded in *Pennoyer* v. *Neff*, 95 U.S. 714 [24 L.Ed. 565], as a prerequisite to the rendition of a personal judgment, is satisfied, in the interest of due process, if the defendant has certain minimum contacts within the territory of the forum as to make it reasonable and just, according to the traditional notions of fair play and substantial justice, to require that he defend the particular suit which is brought there. Accordingly, it was there held that a foreign corporation was amenable to process in the State of Washington when its only contact with that state consisted of the systematic and continuous employment of salesmen, residents of the state, to solicit orders, at prices and terms fixed by the corporation, for its products on a commission basis, the said orders being transmitted to the corporation's office in St. Louis, for acceptance or rejection, and when accepted resulting in a shipment of the merchandise f.o.b. to the purchasers within the state. The rule of *International Shoe Co.* was reaffirmed and applied in *McGee* v. *International Life Ins. Co.* (1957) 355 U.S. 220 [78 S.Ct. 199, 2 L.Ed.2d 223], wherein it was held that the requirements of due process were met by service on a foreign corporation pursuant to a California statute[6] which subjects such a corporation to a suit in California on insurance contracts with residents of this state, even though such corporation cannot be served with process within its borders. In that case the beneficiary named in a policy of life insurance issued to a resident of California brought a suit against a Texas insurance company which had assumed the obligation owed the insured by his original insurer. Except for the policy in question, the said insurance company had never solicited or done any business in California nor did it ever

---

[6]California Insurance Code sections 1610 to 1620, inclusive.

have an office or agent in this state. It was held, however, that the delivery of the insurance contract in California, the mailing of premiums from there, and the residence of the insured in this state when he died, supplied sufficient minimum contacts as to give the contract upon which the suit was based a substantial connection with the State of California for purposes of due process.

The rationale of the rule in *International Shoe Co.* has been followed and applied by the California reviewing courts. Thus in *Florence Nightingale School of Nursing* v. *Superior Court* (1959) 168 Cal.App.2d 74 [335 P.2d 240], a foreign corporation which had no place of business, no agents, employees or representatives, and no records of its business in California, was held to be doing business in this state where its activity was confined to the solicitation of students for its correspondence courses in nursing by advertising in numerous magazines in this state, and where, upon inquiry made in response to such advertisement, it mailed to a prospective California student, a form letter, descriptive brochure, and an application, and where, upon enrollment, the students received lessons by mail, submitted their work by mail, and received comments and criticisms from the foreign corporation by mail. The gist of the holding is that there is no essential difference between solicitation by agents in California and solicitation by advertising in magazines, and that systematic and continuous solicitation, plus continuous, regular, and systematic activity in this state, producing a flow of business in California which creates obligations therein, constitutes ''doing business'' for the purpose of amenability to process and jurisdiction.

Again, in *Empire Steel Corp.* v. *Superior Court, supra,* 56 Cal.2d 823, the court held that a parent foreign corporation was doing business in California through the ownership of a wholly owned and controlled subsidiary corporation doing business in California. Our Supreme Court there recognized the rule declared in *Cannon Mfg. Co.* v. *Cudahy Packing Co.,* 267 U.S. 333 [45 S.Ct. 250, 69 L.Ed. 634], that the ownership and control of a subsidiary corporation does not per se subject the parent corporation to jurisdiction within the state where the subsidiary is engaged in business activity, but held that the *Cannon Mfg. Co.* rule was not applicable where the corporate entities are not sufficiently preserved and the subsidiary corporation is the *alter ego* of the foreign parent

corporation. Accordingly, it was held in *Empire Steel Corp.* that the minimum contact test was satisfied when the parent corporation knowingly caused its California subsidiary to make the contracts which were the subject of the pending action while the subsidiary was in fact insolvent, but had the appearance of financial responsibility. Among the other factors considered by the court in concluding that the foreign corporation had engaged in activities creating substantial contacts in California in relation to the claim asserted were the following: Keeping the subsidiary in business beyond a period safe for persons dealing with the subsidiary; the residence of the president of the parent corporation in California; the consequences within California of the activities of the parent corporation in the foreign state; the occurrence of the alleged breach of contract, which was the subject of the pending action, in California; the fact that the contract was entered into and was to be performed in California; and the manifest interest of California in providing a forum for local creditors injured by alleged frauds effected through a California subsidiary. It is significant to note that, in *Empire Steel Corp.*, the Supreme Court does not consider continuous activity resulting in substantial contact as the necessary criterion for determining whether a foreign corporation is doing business in this state, but declares that "the analysis of the activities of a foreign corporation should not be considered merely quantitatively, but in terms of their 'quality and nature,' and their connection with the obligations sued upon." (P. 832.)

More recently, in *American Continental Import Agency* v. *Superior Court,* 216 Cal.App.2d 317 [30 Cal.Rptr. 654], it was held that a foreign corporation was doing business in this state, so as to make it amenable to process and the jurisdiction of the superior court of this state, where it purchased goods on a systematic and substantial basis, though by purchase orders issued in and mailed from Germany, where it sent one of its representatives to California on four occasions for the purpose of expediting compliance by the vendor with the agreement for the sales of the articles, and where the obligation in controversy was incurred in the purchase of California goods.

The rationale of the foregoing cases is that to the extent that a corporation exercises the privilege of conducting activities within this state, it enjoys the benefits and protection of the laws of this state; and that in the exercise of that privilege, certain obligations may arise out of or in con-

nection with the activities within the state. (See *Henry R. Jahn & Son* v. *Superior Court*, 49 Cal.2d 855, 860 [323 P.2d 437]; *International Shoe Co.* v. *Washington, supra,* at p. 319 [66 S.Ct. 154, 90 L.Ed. at p. 104, 161 A.L.R. at p. 1063].) Again adverting to Nafco's activities relative to the financing of aircraft purchased in this state, the record amply demonstrates that this activity produced a large volume of business from the residents of California from which Nafco received the benefits. When necessary to facilitate this business or to effect compliance with its finance contracts, Nafco sent its representatives into this state. It is reasonable to assume that this presence was of value to Nafco in the performance of contractual obligations by California residents. While so engaged it was entitled to the benefits and protection of the laws of this state. It not only had access to our courts to enforce any rights in regard to these transactions, but on two occasions it actually availed itself of the benefits of our laws and the use of our courts.

█ As we have pointed out above, it is not enough that a foreign corporation engage in activities creating substantial contracts in California, but these must be in relation to the claim asserted. We are satisfied that this requirement is present in the case at bench. The alleged cause of action is connected directly with Nafco's financing activities in this state. Plaintiffs claim that the financing arrangements between Harper and Nafco were in fraud of creditors; that they were entered into without a fair consideration; that Harper was guilty of fraud in executing the subject chattel mortgages; that Nafco was aware of Harper's fraudulent intent; that Harper was thereby rendered insolvent; and that as a result of Nafco's repossession and sale of the nine aircraft in question, Harper has no property from which plaintiffs can satisfy their claim. Plaintiffs' cause of action is clearly related to Harper's dealings with Nafco. Harper was not only a resident of California, but a dealer for Cessna Aircraft Company, which wholly owned Nafco. We are of the opinion, accordingly, that the interest of this jurisdiction to provide a forum for local creditors injured by an alleged fraud effected through a California subsidiary, as recognized in *Empire Steel Corp.,* is just as manifest under the circumstances of the instant case.

The order is reversed.

Bray, P. J., and Sullivan, J., concurred.