[No. B219289. Second Dist., Div. Four. Nov. 23, 2010.]

BBA AVIATION PLC, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
CHARLES ENGEN, Real Party in Interest.

424

**COUNSEL**

Gladstone Michel Weisberg Willner & Sloane, Allen L. Michel and Teresa R. Tracy for Petitioner.

No appearance for Respondent.

Tron & Tron, Lanny M. Tron and Terry L. Tron for Real Party in Interest.

**OPINION**

**EPSTEIN, J.**—Charles Engen sued his former employer, Ontic Engineering and Manufacturing, Inc. (Ontic), and its parent corporation, BBA Aviation PLC (BBA), for wrongful termination. Petitioner, BBA, moved to quash service of the summons and complaint for lack of personal jurisdiction and ineffective service of process. Respondent, the Superior Court of Los Angeles County (trial court), denied the motion and found jurisdiction over BBA proper under the representative services doctrine. BBA seeks a writ of

mandate directing the trial court to vacate its order and grant BBA's motion to quash. BBA contends that the representative services doctrine does not apply because it is a holding company. BBA also claims that no alternative basis for jurisdiction exists. We agree and issue a writ of mandate.

## FACTUAL AND PROCEDURAL SUMMARY

In 2005, plaintiff and real party in interest, Charles Engen, was hired by Ontic as a computer programmer analyst. He was terminated in 2008. Following his termination, Engen filed a wrongful termination suit against Ontic and its English parent company, BBA. The complaint alleged BBA was an agent of Ontic, but all the allegations were directed at Ontic.

Ontic was acquired by BBA in 2006 and is a wholly owned subsidiary. Ontic's executive office and sole facility are located in Chatsworth, California. Ontic manufactures licensed products for the aviation industry. Ontic has its own corporate officers, human resources staff and financial personnel. Ontic's president, James Gerwien, who was president prior to 2006, is also president of BBA's component, repair and overhaul group, and a member of BBA's executive management committee.

BBA is an English company headquartered in London, England. BBA stock is traded on the London Stock Exchange but not on any stock exchange in the United States. BBA's branding appears on Ontic's signage, building front, employee uniforms, badges, and stationery. But BBA is not registered to do business in California and does not have any office, place of business, or employees in California.

BBA filed a motion to quash service of the summons and complaint for lack of personal jurisdiction and ineffective service of process. In response to the motion, Engen argued that the court has general and specific personal jurisdiction over BBA. The general jurisdiction claim was based on BBA's direct contacts with the state and the representative services doctrine, which imputes the court's jurisdiction over a subsidiary to its parent corporation when the subsidiary only operates in support of the parent's own business.[1]

BBA contended that the trial court lacks both specific and general jurisdiction. Specifically, BBA argued the representative services doctrine does not apply because BBA is a holding company whose sole business is investing in

---

[1] Although Engen did not explicitly advance an agency theory as a basis for general jurisdiction, his statement of facts includes a claim that Ontic was an agent of BBA. We treat this factual allegation as an argument that the court's jurisdiction over Ontic should be imputed to BBA.

its subsidiaries. In support of this claim, BBA produced supplemental declarations by its secretary, Zillah Stone, and Gerwien. Stone stated: "BBA itself operates exclusively as a holding company not a trading company. BBA does not itself directly produce or provide any goods or services for any consumer or business customer. Its only business is the investment in its subsidiaries." According to Stone, Ontic is a wholly owned subsidiary of BBA US Holdings, another BBA subsidiary. Stone produced an organizational chart showing that several subsidiaries separated BBA and BBA US Holdings. Gerwien also stated Ontic was owned by BBA US Holdings, but that Ontic was the sole owner of its licenses and products.

The trial court denied the motion to quash, finding the representative services doctrine applicable. The trial court was "persuaded by the plaintiff's submission that there was involvement in Ontic's businesses . . . and that had Ontic not been doing it, [BBA] would have been doing it themselves." The trial court rejected BBA's claim that it was a holding company, despite Stone's affidavit. The trial court emphasized that BBA did not identify itself as a holding company in its consolidated annual reports or any other documents and publications. Instead, the annual reports described BBA as a business providing services to the aviation industry. The court stated that if BBA was truly a holding company, it would support that claim by documentation, and that Stone's "bald assertion" was unconvincing in the absence of such documentation. The trial court did not rule on specific jurisdiction or any of the alternative bases for general jurisdiction. The trial court found the service of process proper.

BBA petitioned our court for writ of mandate vacating the trial court's order and directing the court to grant the motion to quash. We denied the petition. BBA then sought review of our order by the California Supreme Court. The Supreme Court granted review and directed us to vacate our order denying the petition and to issue an order directing the trial court to show cause why the relief sought in the petition should not be granted. We issued an order to show cause pursuant to the Supreme Court's direction. Because we now grant the requested relief based on the jurisdictional issue, we do not reach BBA's claim of ineffective service of process.

## DISCUSSION

### I

When a nonresident defendant challenges personal jurisdiction, the plaintiff must prove, by a preponderance of the evidence, the factual basis justifying the exercise of jurisdiction. (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 273 [127 Cal.Rptr.2d 329, 58 P.3d 2] (*Pavlovich*).) The plaintiff

must do more than merely allege jurisdictional facts; the plaintiff must provide affidavits and other authenticated documents demonstrating competent evidence of jurisdictional facts. (*In re Automobile Antitrust Cases I & II* (2005) 135 Cal.App.4th 100, 110 [37 Cal.Rptr.3d 258].) If the plaintiff does so, the burden shifts to the defendant to present a compelling case that the exercise of jurisdiction would be unreasonable. (*Pavlovich, supra*, 29 Cal.4th at p. 273.)

When the jurisdictional facts are not in dispute, personal jurisdiction is a legal question for de novo review. (*Snowney v. Harrah's Entertainment, Inc.* (2005) 35 Cal.4th 1054, 1062 [29 Cal.Rptr.3d 33, 112 P.3d 28] (*Snowney*).) If the jurisdictional facts are conflicting, we review the lower court's factual determinations for substantial evidence, but still review its legal conclusions de novo. (*Dorel Industries, Inc. v. Superior* Court (2005) 134 Cal.App.4th 1267, 1273 [36 Cal.Rptr.3d 742] (*Dorel*).)

■ California courts may exercise jurisdiction on any basis that is not inconsistent with the state and federal Constitutions. (Code Civ. Proc., § 410.10; see also *Snowney, supra*, 35 Cal.4th at p. 1062.) A forum state may exercise personal jurisdiction over a nonresident if the defendant has minimum contacts with the state such that asserting jurisdiction does not violate traditional notions of fair play and substantial justice. (*Internat. Shoe Co. v. Washington* (1945) 326 U.S. 310, 316 [90 L.Ed. 95, 66 S.Ct. 154].) Minimum contacts exist where the defendant's conduct in, or in connection with, the forum state is such that the defendant should reasonably anticipate being subject to suit in that state. (*World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, 297 [62 L.Ed.2d 490, 100 S.Ct. 559].) Under the minimum contacts test, "[p]ersonal jurisdiction may be either general or specific." (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 445 [58 Cal.Rptr.2d 899, 926 P.2d 1085].) We will treat each type separately.

■ A nonresident defendant is subject to general jurisdiction if its contacts with California are substantial, continuous, and systematic. (*Snowney, supra*, 35 Cal.4th at p. 1062.) When the nonresident defendant is a parent corporation of a subsidiary which does business in California, the minimum contacts may be direct between the parent and the state, or imputed to the parent via its subsidiary. General jurisdiction over a local subsidiary extends to the foreign parent under an alter ego theory, general principles of agency, or under the representative services doctrine, a narrow species of agency. (*F. Hoffman-La Roche, Ltd. v. Superior Court* (2005) 130 Cal.App.4th 782, 796 [30 Cal.Rptr.3d 407] (*F. Hoffman-La Roche*).) Engen does not claim Ontic is an alter ego of BBA, and we only treat the agency theory and the representative services doctrine.

■ " 'An agency is proved by evidence that the [entity] for whom the work was performed had the right to control the activities of the alleged agent.' " (*F. Hoffman-La Roche, supra*, 130 Cal.App.4th at p. 797.) But for the purposes of jurisdiction, the analysis begins with "the firm proposition that neither ownership nor control of a subsidiary corporation by a foreign parent corporation, without more, subjects the parent to the jurisdiction of the state where the subsidiary does business." (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 540 [99 Cal.Rptr.2d 824] (*Sonora*).) A certain level of control, in terms of direction and oversight, is to be expected in any ownership situation, and it is the " 'rare occasion' where a court is willing to treat a parent and subsidiary as one entity for jurisdictional purposes." (*F. Hoffman-La Roche, supra*, 130 Cal.App.4th at p. 797.) Thus, agency supports the imputation of jurisdiction only when the control exercised over the subsidiary "is so pervasive and continual" that the subsidiary is just a "means through which the parent acts, or nothing more than an incorporated department of the parent." (*Sonora, supra*, 83 Cal.App.4th at p. 541.) The parent's general executive control is not enough and the parent must in effect "tak[e] over performance of the subsidiary's day-to-day operations in carrying out [the parent's] policy." (*Id.* at p. 542, italics omitted.)

■ The representative services doctrine is a variation of agency, but does not depend on whether the parent enjoys pervasive and continuous control over the subsidiary as to establish a general agency relationship. (See *F. Hoffman-La Roche, supra*, 130 Cal.App.4th at p. 802.) Under the representative services doctrine, general jurisdiction may be exercised over a foreign parent corporation when the local agent essentially exists only to further the business of the parent, and but for the local agent's existence, the parent would be performing those functions in the forum itself. (*Id.* at p. 798.) The doctrine "supports the exercise of jurisdiction when the local subsidiary performs a function that is compatible with, and assists the parent in the pursuit of, the parent's own business." (*Sonora, supra*, 83 Cal.App.4th at p. 543, italics omitted.) But "the doctrine does not support jurisdiction where the parent is merely a holding company whose only business pursuit is the investment in the subsidiary." (*Ibid.*) When the parent corporation is a holding company, " 'the subsidiary is not performing a function that the parent would otherwise have had to perform itself . . . ,' " because a holding company performs no function outside of investing in its subsidiaries, and thus, " 'imputing jurisdictional contacts would be improper.' " (*Ibid.*)

■ The trial court based its assertion of personal jurisdiction solely on the representative services doctrine, and we treat this issue first. BBA contends it is a holding company and the representative services doctrine does not apply. The burden was on Engen to prove BBA was not a holding company. For purposes of appellate review, we consider whether there is

substantial evidence to support the court's finding it was not. (*Dorel, supra,* 134 Cal.App.4th at p. 1273.)

█ A holding company is a "company formed to control other companies, [usually] confining its role to owning stock and supervising management. . . . It does not participate in making day-to-day business decisions in those companies." (Black's Law Dict. (9th ed. 2009) p. 319, col. 1.) A true holding company does not engage in operational control of the businesses that it owns. (*Sonora, supra,* 83 Cal.App.4th at pp. 543–545.) A finding that corporation is not a legitimate holding company requires a showing that the corporation conducted its own operations or transactions. (See *Golden State T. & R. Corp. v. Johnson* (1943) 21 Cal.2d 493 [133 P.2d 395] [company is not a holding company where its board of directors authorized various transactions to purchase property].)

Engen and the trial court relied heavily on *Dorel.* In that case, the plaintiff was injured by a defective child car seat. He sued, among others, the manufacturer and distributor of the child car seat, Dorel Juvenile Group, and its grandparent corporation, Dorel Industries. (*Dorel, supra,* 134 Cal.App.4th at p. 1269.) Dorel Industries was a Canadian corporation that began as a designer and manufacturer of car restraints but stopped producing products when it acquired two independent manufacturers and merged them into Dorel Juvenile Group. Dorel Juvenile Group manufactured the restraints in the United States which Dorel Industries imported into Canada for its local customers. (*Id.* at p. 1270.) The appellate court found Dorel Industries was not a holding company because it was undisputed that Dorel Industries was involved in the importation and sale of child car seats manufactured by Dorel Juvenile Group. (*Id.* at pp. 1279–1280.)

█ By contrast, Engen has presented no substantial evidence to show BBA is actually involved in its own operation of aviation products. There is no evidence of a business license or any facilities held in the BBA name. Nor is there evidence that BBA's board of directors authorized transactions, outside of acquiring subsidiaries. Instead, Engen points to BBA's branding on Ontic's signage, uniforms, and stationery, and relies on statements BBA made in its consolidated annual reports and Web site, referring to its subsidiaries as "we," and describing itself as a business in the aviation services industry. The court cited BBA's annual consolidated reports as the principal reason for its finding that BBA is more than a mere holding company. It stated that if BBA was truly a holding company, there would be some documentation showing that to be the case. In addition, while the trial court held that the presence of BBA's branding on Ontic property would not, standing alone, support jurisdiction, it concluded that the reports and branding together demonstrate Ontic was not a holding company.

■ The consolidated reports do not constitute substantial evidence to support the trial court's finding that BBA is not a holding company. First, while placing weight on the use of "we" in the consolidated reports, Engen and the trial court ignored references in the report to "our portfolio of businesses" when describing actual operations and services. If we are to put weight in the language of these reports, then references to its subsidiaries as a "portfolio" suggest a passive role in operations. More importantly, "[t]he cases are unanimous that consolidated reporting is standard business practice and will not support jurisdiction in the absence of evidence establishing an agency relationship." (*Sonora, supra,* 83 Cal.App.4th at p. 549.) We interpret the BBA branding in the same fashion. (See *DVI, Inc. v. Superior Court* (2002) 104 Cal.App.4th 1080 [128 Cal.Rptr.2d 683].) The use of "we" or "the Company" or "BBA" does not prove that BBA and Ontic were a single entity in practice and does not turn a holding company into an operating company.

The trial court was aware of this case law but rejected the underlying claim that BBA was a holding company, and cited the reports as evidence that BBA did not call itself a holding company. We are not persuaded. It makes little sense to recognize consolidated reports are insufficient to convert a holding company into an operating company, but conclude that failing to identity oneself as a holding company in consolidated reports proves the entity is not a holding company.

Given Engen's limited evidence, greater weight should be placed on the sworn declarations of Gerwien and Stone. Gerwien stated that Ontic is a wholly owned subsidiary of BBA US Holdings, a subsidiary of BBA. Stone confirmed this and added that several layers of subsidiaries separate BBA from BBA US Holdings. Stone produced an organizational chart to demonstrate the corporate structure. Stone explicitly stated that BBA is a holding company with no operations of its own and that Ontic is its only subsidiary with day-to-day operations to sell products and services. The trial court dismissed Stone's statements as "bald assertion[s]," but California courts have relied on similar statements made by people in similar positions. (See *DVI, Inc. v. Superior Court, supra,* 104 Cal.App.4th at p. 1091 [granting defendant's writ of mandate to quash service when defendant's sole evidence was declarations by a single person who acted as its secretary, general counsel and vice-president].)

■ Even if BBA is not a holding company, in order for the representative services doctrine to apply, Engen must also prove that Ontic did not pursue its own business and only operated for the benefit of BBA. In *F. Hoffman-La Roche*, the plaintiff sued a Swiss pharmaceutical company and its United States subsidiaries for the suicidal effects of the acne drug, Accutane. (*F. Hoffman-La Roche, supra,* 130 Cal.App.4th at p. 789.) The

Swiss company sold the active ingredients to its United States subsidiaries who manufactured and sold the drug in California. (*Ibid.*) The appellate court did not apply the representative services doctrine, even though the Swiss company was not a holding company. The court held there was no evidence that the United States subsidiaries "conduct[ed] their core pharmaceutical operations . . . other than autonomously or that they do so simply in furtherance of [the Swiss parent's] business." (*Id.* at p. 804.) While the representative services doctrine is applied separately from general jurisdiction based on agency, the doctrine still requires a showing of a high level of control such that the subsidiary is just an instrumentality of the parent's own business. (*Id.* at p. 802.) Gerwien stated that Ontic is the sole owner of its licenses and products. Engen produces no evidence to the contrary. We conclude the representative services doctrine does not support general jurisdiction over BBA.

## II

 Engen also claims that jurisdiction over BBA is proper under general agency principles. The trial court did not address a general agency theory of jurisdiction. Therefore, we make an independent determination of whether or not Ontic was an agent of BBA. "The nature of the control exercised by the parent over the subsidiary necessary to put the subsidiary in an agency relationship with the parent must be over and above that to be expected as an incident of the parent's ownership of the subsidiary and must reflect the parent's purposeful disregard of the subsidiary's independent corporate existence." (*Sonora, supra,* 83 Cal.App.4th at p. 542.) In *Sonora,* the Court of Appeal held that a finding of agency required a showing that the parent corporation "directed or participated in the methods or means by which [the subsidiary] performed [its] function." (*Id.* at p. 551.) Engen has failed to demonstrate that BBA exercised pervasive and continuous control over Ontic's day-to-day operations that went beyond the normal parent-subsidiary relationship.

 Statements made by Gerwien demonstrate that Ontic has its own corporate officers, human resources staff, and financial personnel. In response, Engen argues that the existence of common officers and directors between the two corporations supports a finding of agency. Gerwien is also president of BBA's component, repair, and overhaul group, and a member of BBA's executive management committee. The committee is responsible for operational management of BBA and for implementing the BBA board's decisions. Stone stated that the terms "Component Repair and Overhaul" group were used to identify subgroups of BBA subsidiaries that carried out similar operations and that individuals within these subgroups would be given titles such as president or vice-president. However, Stone stated that these subgroups are not formal legal entities and the titles do not establish any formal

legal positions within BBA. Even if Gerwien did hold a formal position within BBA, it has long been considered a "normal attribute of ownership that officers and directors of the parent serve as officers and directors of the subsidiary." (*Sonora, supra,* 83 Cal.App.4th at pp. 548–549.) Engen has not presented any evidence that Gerwien's performance as president of Ontic was compromised by his executive roles with BBA. Absent such a showing, the mere interlocking of directors and officers "is insufficient to rebut the presumption that each common officer or director wore the appropriate 'hat' when making corporate and operational decisions for the respective entities." (*Id* at p. 549.)

Similarly, Engen argues that the executive management committee participated in a two-day planning workshop with Ontic in California, and that BBA's chief executive officer, Simon Pryce, visited Ontic's facility on several occasions. Engen alleges that on Pryce's first visit, he noticed problems with Ontic's facility and directed changes be made. Upon noticing the same problem on his second visit, Pryce became upset and demanded the problem be addressed. Pryce visited a third time to see that the changes were made. BBA's objection to Engen's declaration for lack of foundation was overruled. The trial court erred in overruling BBA's objection because Engen provided no proof that he had personal knowledge of the events. We are then left with Gerwien's statements that Pryce, who joined BBA in 2007, only visited Ontic twice during Engen's employment. According to Gerwien, in his two visits, Pryce's only comment concerning the facility was an observation that an exposed chain-link fence presented a safety hazard. Pryce did not direct anyone at Ontic to fix the fence or make any other changes to the facility.

Beyond that, such interactions between BBA and Ontic do not exceed the normal parent-subsidiary relationship. (See *Dorel, supra,* 134 Cal.App.4th at p. 1276.) The *Dorel* court found no agency relationship existed despite evidence that members of the parent corporation's executive committee attended meetings with, and made frequent visits to, the subsidiary and its customers. (*Ibid.*) Here, BBA's alleged involvement in Ontic's operations was even less frequent and pervasive.

█ Next, Engen asserts Ontic is an agent of BBA because BBA's name and logo appeared on Ontic's signage, employee uniforms, badges, business cards, and employment documents. Engen does not present any authority for the claim that the mere appearance of a parent's logo on its subsidiary's documents constitutes pervasive control over day-to-day operations, and we find such branding insufficient to prove the existence of a single entity. (See *Kaplan v. Coldwell Banker Residential Affiliates, Inc.* (1997) 59 Cal.App.4th 741 [69 Cal.Rptr.2d 640] [franchisee's use of franchisor's logo and trademark

is not enough to establish an agency relationship for the purposes of liability].) Engen next points out that the name BBA appeared on his employee retirement and medical benefit plans. BBA countered with uncontroverted evidence that while BBA offered employment benefit packages to its subsidiary's employees, Ontic still operated its own employee benefit program that was completely independent of BBA. ▮ Again, Engen has offered no support for the assertion that dual employment benefit plans constitute a level of control exceeding a normal parent-subsidiary relationship, and we find none.

## III

▮ Engen also claims that the court has direct general jurisdiction over BBA. A nonresident defendant may be subject to the general jurisdiction of our courts if its contacts with California are substantial, continuous, and systematic. (*Snowney, supra*, 35 Cal.4th at p. 1062.) The critical acts may be taken directly by the parent or indirectly through the subsidiary, but in all events must be attributable to the parent corporation itself. Thus, the relevant inquiry here is the nature of the defendant's own contacts with the forum state, not its subsidiary's contacts. (*Sonora, supra*, 83 Cal.App.4th at p. 552.) Whether a defendant's contacts in the forum are continuous and systematic depends on various factors including maintenance of an office, presence of employees, use of bank accounts, and the marketing or selling of products in the forum state. (*Helicopteros Nacionales de Colombia, S. A. v. Hall* (1984) 466 U.S. 408, 415 [80 L.Ed.2d 404, 104 S.Ct. 1868].) These factors are not exhaustive but provide guidance as to the type and degree of contacts the defendant must have in order to justify the exercise of general jurisdiction. (*F. Hoffman-La Roche, supra*, 130 Cal.App.4th at p. 796.)

It is undisputed that BBA is not registered to do business in California and does not have any office, place of business or employees in California. Nor does Engen offer any evidence that BBA marketed or sold products independently of Ontic. In response, Engen advances many of the same facts used to support his argument that Ontic was an agent of BBA, including interlocking directors and officers, and BBA's branding on Ontic property. Just as with his claim of an agency relationship, Engen offers no support that such action constitutes substantial, continuous and systematic contacts.

## IV

▮ Finally, Engen claims there is a sufficient basis to impose specific jurisdiction over BBA. A nonresident defendant who lacks sufficient contacts in California to establish general jurisdiction may still be subject to the specific jurisdiction of our courts if there is a sufficient nexus among the

defendant, the state, and the litigation. (*Snowney, supra*, 35 Cal.4th at p. 1062.) Specific jurisdiction exists if (1) the defendant has purposefully availed itself of forum benefits with respect to the matter in controversy; (2) the controversy is substantially related to or arises out of the defendant's contacts with the forum; and (3) the assertion of jurisdiction would comport with fair play and justice. (*Dorel, supra*, 134 Cal.App.4th at p. 1274; see also *Pope v. National Aero Finance Co.* (1963) 220 Cal.App.2d 709, 719 [33 Cal.Rptr. 889] [the parent corporation's acts establishing the basis for jurisdiction must be related to the cause of action for which jurisdiction is sought].) The trial court did not reach specific jurisdiction, so we review this issue de novo.

■ Mere ownership of a subsidiary in the forum state does not constitute purposeful availment. (*HealthMarkets, Inc. v. Superior Court* (2009) 171 Cal.App.4th 1160, 1168 [90 Cal.Rptr.3d 527].) "A parent company purposefully avails itself of forum benefits through the activities of its subsidiary, as required to justify the exercise of specific personal jurisdiction, if and only if the parent deliberately directs the subsidiary's activities in, or having a substantial connection with, the forum state." (*Id.* at p. 1169.)

It is not enough for Engen to show that BBA had general involvement in his employment. Rather, he must show that BBA's activities establishing jurisdiction related specifically to his termination. (*Sammons Enterprises, Inc. v. Superior Court* (1988) 205 Cal.App.3d 1427 [253 Cal.Rptr. 261] (*Sammons Enterprises*).) He has not done so. In *Sammons Enterprises*, a former hotel employee sued his hotel employer and its foreign parent corporation, Sammons, for wrongful termination. The parent moved to quash service of summons for lack of personal jurisdiction. In support of his assertion of specific jurisdiction, the plaintiff presented evidence that he received Sammons stock options, was covered by Sammons's Employee Retirement Plan and was once given a small bonus by Sammons. (*Id.* at p. 1430.) The appellate court found no basis for specific jurisdiction because the plaintiff made no showing that "anyone from Sammons was responsible for or even reviewed or approved the decision to terminate him." (*Id.* at p. 1435.) The court noted that the plaintiff's "wrongful termination claim did not arise out of his stock option or retirement plan" and the bonus check "certainly bears·no relationship to his termination." (*Ibid.*)

Here, Engen presents even less evidence that BBA was involved in his employment, let alone his termination. The separation agreement and release form given to Engen upon his termination named only Ontic as Engen's employer and made no mention of BBA. And, as in *Sammons Enterprises*, Engen's wrongful termination claim did not arise out of BBA's employment benefits, especially since the BBA benefits plans were in addition to Ontic's independent benefit options.

The only evidence Engen presents to prove BBA's involvement in his termination is an e-mail he received from Ontic's vice-president of human resources, Stan Shor, confirming his termination. Shor's electronic signature included his vice-president position, and "BBA Aviation—Legacy Support Group." Based on the signature block, Engen identified Shor as BBA Aviation's vice-president of human resources. This was a mischaracterization. In his supplemental declaration, Shor identified himself as Ontic's vice-president of human resources. Prior to this position, he was Ontic's director of human resources beginning in 2005, a year before Ontic was acquired by BBA. Finally, the e-mail itself demonstrated that Shor had an Ontic e-mail address and was based at Ontic's Chatsworth facility.

## DISPOSITION

BBA's petition is granted. Let a writ of mandate issue directing the trial court to vacate its order denying BBA's motion to quash service of summons and to enter a new order granting the motion. BBA is to recover its costs in this proceeding.

Willhite, J., and Suzukawa, J., concurred.